UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————— x

In re PALL CORP. SECURITIES       :     Master File No. 2:07-cv-03359-JS-ARL
LITIGATION                        :
——————————————————   :     CLASS ACTION
                                  :
This Document Relates To:         :     CONSOLIDATED AMENDED
                                  :     COMPLAINT FOR VIOLATIONS OF
      ALL ACTIONS.                :     FEDERAL SECURITIES LAWS
                                  :
———————————————————   :     JURY TRIAL DEMANDED
                                  x

Lead Plaintiff Macomb County Employees' Retirement System ("Macomb County") has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Pall Corporation ("Pall" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former Pall employees and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of Pall between April 20, 2007 and August 2, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Pall manufactures and markets filtration, purification, and separation products and integrated systems solutions.  This case concerns a massive financial fraud at Pall whereby hundreds of millions of dollars of untaxed foreign earnings were diverted to fund the Company's domestic operations.  Pall, through its subsidiaries, engaged in certain intercompany sales transactions which were never settled through actual cash payments.  Under U.S. tax laws, these unsettled intercompany transactions should have been treated as income on Pall's tax returns,but they were not.  Pall has now admitted that its tax liabilities were understated for a nine year period from 1999 through April 30, 2007 and has restated nine years of financial statements. The Company has further admitted that it owes at least $278 million in back taxes, penalties and interest and may owe an additional $124 million in penalties when final settlements are reached with U.S. and foreign tax authorities.

3.      Throughout the Class Period, Defendants issued numerous statements and filed reports with the SEC regarding the Company's current financial performance and future earnings. These statements were materially false and misleading because Defendants knew, but failed to disclose: (i) that the Company had engaged in an improper tax avoidance scheme whereby it shifted certain of its income to lower tax jurisdictions through the overpayment of commissions to one of its non-U.S. subsidiaries; (ii) that, since at least 1999, the Company's reported income tax liability had been materially understated; (iii) that the Company's publicly disseminated financial statements materially violated Generally Accepted Accounting Principles ("GAAP") and SEC reporting requirements; and (iv) as a result of the foregoing, the Company's effective tax rate would now be significantly higher and the Company will pay back taxes and fines of at least $278 million.

4.      On July 19, 2007, Pall shocked the market by announcing that the Audit Committee of its Board of Directors had commenced an "inquiry" into the "possibly" material understatement of U.S. income tax payments and of its provision for income taxes in certain prior periods beginning with its fiscal year ended July 31, 1999.  In response to this announcement, the price of Pall common stock declined from $48.78 per share to $41.11 per share, on extremely heavy trading volume.

5.      On August 2, 2007, Pall issued a press release announcing that the Company's annual and quarterly financial statements for the fiscal years 1999 through 2006 and for each of the fiscal quarters ended October 31, 2006, January 31, 2007, and April 30, 2007 "should no longer be relied upon" and that a restatement of some or all of those financial statements would be required.  In response to this announcement, the price of Pall common stock declined from $39.10 per share to $38.62 per share, on extremely heavy trading volume.

6.      On January 29, 2008, Pall announced the conclusion of its Audit Committee's inquiry into the Company's underpayment of U.S. income taxes.  Among other findings, the Inquiry

- 2 -

concluded that the underpayment resulted, primarily, from the intercompany sale of products from Pall Netherlands BV to Medsep Corporation that were not settled through actual cash payments.

7.     Then, on March 28, 2008, Pall issued its Form 10-K for the fiscal year ended July 31, 2007 with the SEC, which included restated prior period financial statements revealing the true magnitude of the fraud.  Through July 31, 2006, Defendants overstated Pall's stockholders' equity by $241,599,000, or nearly 26%.  Pall's originally reported earnings for fiscal 2006 alone were overstated by $93,353,000, or 179%.  For the first nine months of fiscal 2007, Pall's reported earnings were overstated by $36,592,000, or 33%.  Through July 31, 2007, the Company has recognized $277,805,000 in additional taxes, penalties and interest.

8.     During the time that Pall was materially understating its tax liabilities and materially overstating its financial results, the Individual Defendants and other Pall insiders sold more than $47.8 million worth of their personally-held shares to the unsuspecting market.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

12.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

13.     Lead Plaintiff Macomb County purchased the common stock of Pall during the Class Period and has been damaged thereby.  Lead Plaintiff's certification has been previously submitted in this litigation and is hereby incorporated by reference.

14.     Defendant Pall is a New York corporation with its principal place of business located at 2200 Northern Boulevard, East Hills, NY 11548.  The Company, together with its subsidiaries, manufactures and markets filtration, purification, and separation products and integrated systems solutions.

15.     Defendant Eric Krasnoff ("Krasnoff") is, and was at all relevant times, Pall's Chairman, Chief Executive Officer ("CEO") and President.  He has been the Company's Chairman and CEO since July 1994.

16.     Defendant Lisa McDermott ("McDermott") is, and was at all relevant times, Pall's Chief Financial Officer ("CFO"), Chief Accounting Officer, Vice President of Finance and Treasurer.  She has been the Company's CFO since January 2006.

17.     Defendants Krasnoff and McDermott are collectively referred to herein as the "Individual Defendants."

18.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

- 4 -

19.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

21.     John Adamovich Jr. ("Adamovich") served as Pall's CFO from January 1998 to November 2004.  Adamovich is a non-party and is not named as a Defendant at this time.

22.     Marcus Wilson ("Wilson") served as Pall's CFO from November 2004 to January 2006.  Wilson is a non-party and is not named as a Defendant at this time.  Prior to that Wilson served as the Company's President beginning in August 2003.

- 5 -

23.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Pall common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Pall's business, operations, management and the intrinsic value of Pall common stock; (ii) enabled the Individual Defendants and other Pall insiders to sell more than 1.8 million shares of their personally-held Pall common stock to the unsuspecting public, generating proceeds of more than $47.8 million; and (iii) caused Plaintiff and other members of the Class to purchase Pall's common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Pall between April 20, 2007 and August 2, 2007, inclusive ("the Class") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Pall common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pall or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

- 6 -

26.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

27.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pall; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and its Business

30.     Defendant Pall describes itself as the "global leader in the rapidly growing field of filtration, separation and purification."  The Company manages its operations through two reportable business segments: Life Sciences and Industrial.

31.     The Life Sciences segment generates approximately 40% of Pall's annual sales through sales of blood and drug filters to the medical and biopharmaceutical markets.  Medical sales, comprising approximately 20% of the Company's annual sales, are derived, primarily, from disposable blood and cardiovascular filtration products sold to blood centers and hospitals.  During 2006, the Company reported that approximately 61% of its global blood filter sales were completed in the Western Hemisphere (primarily North America).  The Company develops and sells certain of its blood storage and filtration devices through various subsidiaries, including Medsep Corporation ("Medsep") located in Covina, Ca.  The Company historically maintained manufacturing and research facilities supporting its blood filter business in Fajardo, Puerto Rico, among other locations. Purportedly, one of the Company's manufacturing entities in Fajardo is a "branch" of Pall Netherlands BV ("Pall Netherlands").[1]  In addition to the Pall Netherlands branch, the Company established two other manufacturing subsidiaries in Puerto Rico: Pall Puerto Rico, Inc. ("PPR") and Pall Biomedical, Inc. ("Biomedical").

----

[1]     Pall Netherlands was reported as a 100% owned subsidiary of Pall in the Company's 1998 Form 10-K.  In the Company's 1999 Form 10-K, Pall reported that a Puerto Rico subsidiary of the Company, formed in 1996, has been "operated as a branch of a wholly-owned controlled foreign corporation (CFC) of the Company" since August 1998.  Based upon information and belief, Lead Plaintiff has alleged herein that the CFC referred to is Pall Netherlands.

32.     Pall's Industrial segment develops and sells products to the aerospace, microelectronic, and general industrial markets.  Lead Plaintiff's allegations here primarily concern the Company's operations within the Life Sciences segment.

### Defendants' Fraudulent Tax Scheme

33.     **Overview of the Scheme**: Defendants engaged in a fraudulent scheme which provided "tax-free" access to "accumulated earnings and profits" sheltered in Pall's offshore tax haven subsidiary, Pall Netherlands, in order to fund its domestic operations and reduce borrowings under its various domestic debt facilities.  The scheme was knowingly carried out at the highest levels of the Company and strictly monitored by Pall's corporate treasury group at the Company's headquarters.  By engaging the fraudulent tax scheme detailed herein, Pall was able to avoid paying more than $237 million in income taxes in the U.S.

34.     The scheme centered on sales of the Company's blood filtration products through Medsep, a Pall subsidiary based in the U.S.  Medsep purchased its inventory from Pall Netherlands, a foreign subsidiary of the Company and the purported "manufacturer" of the products.  Medsep absorbed these manufacturing costs by "purchasing" the goods at a mark-up and reporting minimal taxable income to U.S. tax authorities upon the sale of the products to Pall's third-party customers. Pall Netherlands recorded most of the profits on the transactions, but reported none of its earnings to U.S. tax authorities.  Furthermore, the Netherlands is a tax-haven jurisdiction and therefore Pall Netherlands paid minimal, if any, taxes to local tax authorities.  As the parent of both companies, Pall reported these transactions in a consolidated tax return filed with U.S. tax authorities.  These types of transactions allowed Pall to report an "effective" U.S. income tax rate substantially below the statutory corporate U.S. rate of 35%.

35.     Under U.S. tax laws, these related-party purchase/sale transactions are permissible; however, such transactions are regulated by specific provisions of the Internal Revenue Code, which

were enacted to derail illegal tax avoidance schemes.  The U.S. tax code focuses on, and regulates, the movement of cash funds arising from related-party transactions, such as those engaged in by Medsep and Pall Netherlands, by placing strict limits on the length of time that cash must be paid to settle the transactions.  When Medsep purchased goods from Pall Netherlands, it recorded the transaction as an "intercompany payable;" Pall Netherlands, in turn, recorded the transaction as an "intercompany receivable."  Under U.S. tax regulations, which have been in effect since at least 1988, Medsep was required to pay Pall Netherlands within 30 days or, at the most, 60 day intervals based on the balances outstanding from these transactions.  Pall has admitted that some of the balances Medsep recorded as "intercompany payables" to Pall Netherlands were outstanding for nine years.  Under separate provisions of the Internal Revenue code, which have been in effect since 1962, the "intercompany receivable" balance which remained outstanding on Pall Netherlands' books for longer than 30 or 60 days is considered a "deemed dividend" to the parent corporation – Pall – because Pall had access to and use of the funds paid to Medsep by the Company's outside customers.  As detailed further herein, Pall has admitted that it improperly avoided taxes as it has "self-reported" deemed dividend income of at least $237 million for the nine year period ending in April 2007.

36.    The magnitude of the fraud perpetrated by Defendants is staggering and could not have escaped the attention of Pall's accounting, tax and treasury personnel or the Individual Defendants.  The scheme resulted in Pall having tax-free use of hundreds of millions of dollars of funds diverted from its foreign subsidiary, Pall Netherlands, which Defendants used to fund the Company's domestic operations, thus reducing its domestic borrowing costs.  The Company has never disclosed the actual amount of funds diverted by the scheme, but reasonable estimates can be made based on the Company's post-Class Period admissions.

- 10 -

37.     A floor amount of the total funds diverted can be estimated as $398 million based on Pall's admission that a 2006 "repatriation" of foreign subsidiary earnings of that amount under certain tax incentive legislation enacted by Congress in 2004, which provided a one-time dividend income exclusion of 85%, would yield no tax benefit to the Company because the restatement recognized  more than $398 million in deemed dividend based on the size of the intercompany receivable balance outstanding on Pall Netherlands' books at the end of 2006.  A ceiling for the funds diverted can be estimated as $677 million based on Pall's additional admission that tax liabilities arising from the recognition of deemed dividend income, which again were based on the size of the unpaid intercompany receivable on Pall Netherlands' books, were estimated to be $237 million recognized at the statutory corporate income tax rate of 35%.  ($237 million divided by 35% equals $677 million).

38.     A reasonable range of estimates of the size of the funds diverted by Defendants' scheme is therefore $398 million to $677 million.  The Company's current domestic revolving credit line, which provides its working capital, totals only $500 million.  The Company has not admitted any wrongdoing in connection with its restatement and has characterized the tax underpayments benignly, attributing them to "technical" operations of the Internal Revenue Code.  However, it is apparent that a funds diversion scheme, which at times exceeded the entire Company's domestic borrowing capacity, could not have escaped the attention of Pall's senior management.

39.     **Pall's Senior Management Directed that Medsep Make No Payments to Pall Netherlands**:  Confidential Informant 1 ("CI 1") is a former Director of Taxation for the Company employed from 1982 to 1986.  Following the Company's January 28, 2008 announcement that it had terminated four "tax and treasury" employees involved in the understatement of the Company's taxes, CI 1 contacted and spoke to one of the terminated

- 11 -

employees.  CI 1 stated that the terminated employee had received settlements "of some kind" as part of the termination which precluded the terminated employee from being able to speak to anyone about the events at Pall "short of a subpoena." For that reason, CI 1 declined to identify the terminated employee by name or otherwise and simply referred to the terminated employee as a friend.

40.     CI 1 learned from the terminated employee that approximately "ten years" prior to Pall's January 2008 announcement, the Company had instituted a treasury and tax practice, which instructed that no cash settlement of balances arising from "intercompany transactions" be made between Medsep and Pall Netherlands.  According to CI 1, the terminated employee stated that a decision had been made by Pall's senior management that there was "no point to doing cash transfers" for these intercompany transactions.  The terminated employee further explained that "there was an inkling" that no longer making actual cash transfers "would be an issue," but that Pall's senior management "just didn't think it would be so big a deal."  The terminated employee further stated to CI 1 that Pall was aware that the practice of not making cash transfers for intercompany transactions between Medsep and Pall Netherlands was potentially problematic, but when the terminated employee had expressed concerns to Pall's senior management, the terminated employee had been told "don't worry about it."  CI 1 stated that the terminated employee is "very smart, but not aggressive . . . not one to rock the boat."

41.     CI 1 and the terminated employee also discussed the events giving rise to Pall's first public announcement of the tax understatement in July 2007.  According to CI 1, the terminated employee stated that at sometime prior to July 2007, the Company engaged "outside consultants." The terminated employee did not further identify the consultants or the nature of their engagement. During the course of the consultants' engagement, the terminated employee informed the consultants

of Pall's longstanding practice of not making cash transfers for intercompany transactions between Medsep and Pall Netherlands.  The terminated employee further explained to the consultants Pall's potential "exposure" arising from this practice.  According to CI 1, the terminated employee stated that the consultants "started getting nervous about it."  The terminated employee told the consultants that if they were concerned, they should tell someone at Pall about it.  According to the terminated employee, the consultants reported the "problem" to Pall's audit committee approximately "six to eight months" prior to the Company's January 2008 announcement.  During that six to eight months, the terminated employee worked directly on assignments necessary to complete the restatement.

42.    **Pall's Corporate Treasury Group Controlled Intercompany Funds Transfers**: Confidential Informant 2 ("CI 2") is a former Accounts Payable Manager with Pall's Medsep subsidiary in Covina, CA.  CI 2 was employed by the Company until 2005.  CI 2 explained that at the end of each reporting period (*i.e.*, month, quarter, etc.), it was her job to contact personnel at the other Pall units with which Medsep had engaged in intercompany transfers to ensure that the respective balances for the intercompany transactions balanced.  *CI 2 explained that actual cash was transferred between Pall's operating units that engaged in intercompany transactions, but that the individual operating units, including Medsep, had no role in actually transferring any monies to the other divisions with which Medsep had engaged in an intercompany transfer. Instead, the actual transfer of monies between divisions was handled exclusively by the corporate office.*  Specifically, CI 2 said that Steve Strauss ("Strauss"), who held a Treasury position at the Company's headquarters in New York, informed CI 2 as to how much money had been transferred from Medsep to other Pall divisions, including Pall's operations in Puerto Rico.  CI 2 said Strauss was the key player at the New York office with whom she interacted.

- 13 -

43.     CI 2 stated that Strauss would initiate the money transfer process by sending CI 2 and personnel in Puerto Rico, whose name CI 2 could not recall, an email to the effect of "let's pay this or that amount" of the balance owed by Medsep to Puerto Rico.  CI 2 stated it was definitely the case that Medsep owed Puerto Rico monies, but Puerto Rico also owed Medsep monies for different types of intercompany transactions.  In these circumstances, the respective balances were reduced by the amounts owed and/or due, but ultimately Medsep was still left with a balance owed to Puerto Rico.  CI 2 confirmed that the overall unpaid balance owed by Medsep to the Puerto Rican operations was a very large amount at any given time.

44.     Confidential Informant CI 3 ("CI 3") is a former Accounting Manager with Pall's Medsep subsidiary in Covina, CA.  CI 3 was employed from 2002 until July 2005.  As Accounting Manager, CI 3 was responsible for a number of items, including the accounting for fixed assets.  CI 3 confirmed that Medsep's accounts payable, including verifying and reporting intercompany transactions, were accounted for by CI 2, an accounts payable manager who reported to CI 3.  *CI 3 noted that Medsep's accounts receivables were handled by personnel in New York.*  CI 3 reported to Medsep Controller, Kevin Sullivan, who reported to the Medsep General Manager, Felix Diaz.

45.     CI 3 confirmed that verifying Medsep's intercompany transactions included contacting the other Pall subsidiary involved in the transaction and ensuring that the other subsidiary agreed with the amounts involved.  In this regard, CI 3 was aware that some of Medsep's inter-company transactions involved the Pall Netherlands subsidiary, as well as Pall's Puerto Rican subsidiary.  CI 3 stated that Medsep's financial results were submitted to the corporate office on a monthly basis.  CI 3 explained that Medsep's General Ledger ran on an AS-400 computer.  CI 3 stated that the General Ledger had "no reporting tools," so the data in the General Ledger was "uploaded" into a FRX "reporting tool system" from which various reports could be derived.  It was

from the FRX system that Medsep's financial results for a given period were reported and then submitted to the corporate office for further consolidation into Pall's financial reporting.

46.     Confidential Informant CI 4 ("CI 4") is a former Junior Treasury analyst employed by Pall from July 2001 until August 2004 at the Company's corporate headquarters in East Hills, New York.  From July 2001 until April 2002, CI 1 served as the Executive Assistant to Defendant McDermott.  During that time, CI 4 observed that McDermott had regular meetings with Tom Kelly ("Kelly"), Pall's Director of Treasury and Tax, Pall's former CFO, Adamovich, and Director of Internal Audit, John Myers ("Myers"), among others.  CI 4 did not attend the meetings and could not immediately recall details such as the frequency of the meetings or where they were held.

47.     From April 2002 until August 2004, CI 4 was a Junior Treasury Analyst whose responsibilities included reconciling the Company's bank statements and doing wire transfers for inter-company transactions between Company divisions, as well as processing certain payroll-related matters and handling "month-end payables" for the various Pall subsidiaries.  In this capacity, Boggan initially reported to Ted Frisch ("Frisch"), who reported to Treasurer and Director of Tax, Kelly, who reported to Defendant McDermott.  CI 4 also identified Crawbuck as "the tax guy" at Pall.  CI 4 stated that all wire transfers between he Company's divisions or subsidiaries were executed through Pall's corporate headquarters' treasury group.  CI 4 identified Strauss and Frisch as the only two other individuals who executed wire transfers at Pall's headquarters in the 2002 to 2004 timeframe.  CI 4 stated that the wire transfers were executed based on instructions that CI 4 received from Frisch or the "corporate accounting group," which at that time was head by Defendant McDermott.

48.     In executing wire transfers, CI 4 "utilized a banking software template," which "debited and credited" the respective bank accounts for Pall's various subsidiaries and divisions.  CI

4 explained that Pall's various subsidiaries each maintained separate and distinct accounts with various financial institutions, including Wachovia, Chase and Key Bank.  As a function of CI 4's position, CI 4 was given access to view the balances of these various bank accounts; however, CI 4 could not recall particular balances for the different subsidiaries.  CI 4 stated that the number of transactions between the various subsidiaries and the amounts paid in the intercompany transfers varied.

49.     Confidential Informant 5 ("CI 5") is a former Intercompany Accountant employed by Pall's Life Sciences division in Ann Arbor, Michigan.  CI 5 was employed by Pall from October 2006 until the end of 2007.  As an Intercompany Accountant, CI 5 was responsible for ensuring that the account payable and account receivable balances on the Ann Arbor books matched the reciprocal balances on the books of the subsidiaries with which the Ann Arbor facility had engaged in intercompany transactions.  This process basically involved email communications between Pickens and personnel at the various relevant subsidiaries.  CI 5 reported to Assistant Controller for Pall Life Sciences in Ann Arbor, Cherry Reigel, who, in turn, reported to Pall Life Sciences Controller, Paul Mendoza, who was also based in Ann Arbor.  CI 5 confirmed that all money transfers related to the settlement of intercompany transactions were executed and routed through Pall's treasury group in East Hills.  CI 5 recalled that an individual named "Frisch" was involved in the transactions.

### Pall's Restatement of Previously Issued
### Financial Statements from 1999 to 2007

50.     On July 19, 2007, Pall issued a press release announcing that the Audit Committee of its Board of Directors has commenced an "inquiry" into the "possibly" material understatement of U.S. income tax payments and of its provision for income taxes in certain prior periods beginning with its fiscal year ended July 31, 1999.

51.    Within just two weeks of this announcement, the "inquiry" into "possibly" material understatements of the Company's U.S. tax payments had coalesced into the restatement of all of the Company's published financial statements for the past nine years.  On August 2, 2007, Pall announced that that the Company's annual and quarterly financial statements for the fiscal years 1999 through 2006 and for each of the fiscal quarters ended October 31, 2006, January 31, 2007 and April 30, 2007 "should no longer be relied upon" and that a restatement of some or all of those financial statements would be required.

52.    On March 28, 2008, Pall filed its Form 10-K for the fiscal year ended July 31, 2007 with the SEC, which included restated prior period financial statements revealing the true magnitude of the fraud.   Through July 31, 2006, Defendants overstated Pall's stockholders' equity by $241,599,000, or nearly 26%.  Pall's originally reported earnings for fiscal 2006 alone were overstated by $93,353,000, or 179%.  For the first nine months of fiscal 2007, Pall's reported earnings were overstated by $36,592,000, or 33%.  Through July 31, 2007, the Company has recognized $277,805,000 in additional taxes, penalties and interest.

53.    As detailed herein, the scheme to inflate the Company's earnings and equity was carried out through a series of intercompany transactions designed to shield the earnings of certain of Pall's foreign subsidiaries from U.S. income taxation.   The scheme was highly successful as illustrated by the following table, which details the consistent overstatement of Pall's earnings during each of the restated periods:

| *Net Earnings Overstatement by Year:* | | | | *Estimated Understatement of Taxes* | |
|---|---|---|---|---|---|
| *Period* | *$ 000's* | *%* | | *Description:* | *$ 000's* |
| *1999* | *$5,964* | *13%* | | | |
| *2000* | *$19,540* | *15%* | | *Restated provision for* | |
| *2001* | *$18,780* | *19%* | | *Income Taxes* | *$237,000* |
| *2002* | *$28,395* | *63%* | | | |
| *2003* | *$20,228* | *24%* | | *Restated interest expense* | *41,000* |
| *2004* | *$27,840* | *23%* | | | |
| | | | | *Total Net Earnings* | |
| *2005* | *$27,113* | *24%* | | *Restatement* | *$278,000* |
| *2006* | *$93,353* | *179%* | | | |
| | | | | *Potential additional* | |
| *Q1 2007* | *$8,433* | *33%* | | *penalties* | |
| | | | | *that may be assessed by* | |
| *Q2 2007* | *$11,456* | *179%* | | *U.S.* | |
| *Q3 2007* | *$16,703* | *33%* | | *And foreign tax authorities* | *$124,000* |
| | | | | | |
| *Total* | *$277,805* | | | | |

54.     The Company's initial announcement on July 19, 2007 of the "possibly" material understatement of its U.S. income tax payments had a devastating effect upon Pall's market capitalization, causing it to fall by more than $900 million in a single day of trading.  On July 20, 2007, Pall common stock closed at $41.11 per share, a decline of $7.67, or nearly 16%, from the previous day's close of $48.78 on heavy volume of more than 8 million shares.  Following the announcement of the restatement on August 2, 2007, Pall common shares closed at $38.62 per share on August 3, 2007.  On August 9, 2007, an announcement that the Company's credit rating had been lowered caused Pall common shares to fall to $37.49 at the close of trading on August 10, 2007.  In a recent statement, Defendant McDermott attributed the decline of more than $1 billion in the Company's market capitalization to the disclosure of Defendants' tax underpayment scheme.

55.     On January 29, 2008, Pall announced the conclusion of its Audit Committee's inquiry into the Company's underpayment of U.S. income taxes.   Among other findings, the Inquiry concluded that the underpayment resulted, primarily, from the intercompany sale of products from Pall Netherlands to Medsep that were not settled through actual cash payments.   As detailed below, both the tax implications and the cash management decisions related to these "intercompany" transactions were regularly reported to Pall's senior management, who directed that the balances not be settled through cash transfers.

### Materially False and Misleading Statements
### Issued Prior to the Class Period

56.     Prior to the start of the Class Period, Pall issued numerous press releases announcing, among other things, its financial results and Pall filed quarterly and annual reports with the SEC on Forms 10-Q and 10-K.   The Company's press releases and quarterly and annual reports filed with the SEC were each materially false and misleading because Pall was overstating its reported financial results by materially understating its income tax liability.   Moreover, the Company's SEC filings falsely represented that the financial statements contained therein were prepared in accordance with GAAP and also falsely represented the Company's effective tax rate and the factors affecting the Company's effective tax rate.   These material false and misleading statements remained alive and uncorrected during the Class Period.

57.     The following tables summarize and compare the Company's originally reported net earnings and restated net earnings (Table 1), originally reported income tax provisions and restated income tax provisions (Table 2) and originally reported interest expense and restated interest expense (Table 3), for each of the restated periods from July 31, 1999 to April 30, 2006, which Pall has now admitted were materially misstated due to Defendants' failure to report "deemed dividends" form the Company's Pall Netherlands subsidiary, among other things:

Table 1 - Net Earnings

| Period | ($000's) Originally Reported Net Earnings | Understatement of Taxes, Interest and Penalties (Decrease) | Restated Net Earnings |
|---|---|---|---|
| 1999 | $51,507 | ($5,964) | $45,543 |
| 2000 | 146,636 | (19,540) | 127,096 |
| 2001 | 118,010 | (18,780) | 99,230 |
| 2002 | 73,234 | (28,395) | 44,839 |
| 2003 | 103,202 | (20,228) | 82,974 |
| 2004 | 151,573 | (27,840) | 123,733 |
| 2005 | 140,816 | (27,113) | 113,703 |
| 2006 | 145,493 | (93,353) | 52,140 |
| Q1 2007 | 24,434 | (8,433) | 16,001 |
| Q2 2007 | 55,803 | (11,456) | 44,347 |
| Q3 2007 | 67,074 | (16,703) | 50,371 |

Table 2 - Income Tax Provisions

| Period | ($000's) Originally Reported Provision for Income Taxes | Understatement of Income Tax Liabilities | Restated Provision for Income Taxes |
|---|---|---|---|
| 1999 | $7,397 | $5,961 | $13,358 |
| 2000 | 41,768 | 18,452 | 60,220 |
| 2001 | 32,310 | 16,734 | 49,044 |
| 2002 | 26,741 | 25,880 | 52,621 |
| 2003 | 40,034 | 16,866 | 56,900 |
| 2004 | 46,259 | 24,741 | 71,000 |
| 2005 | 40,255 | 23,066 | 63,321 |
| 2006 | 64,883 | 86,207 | 151,090 |
| Q1 2007 | 4,755 | 3,523 | 8,278 |
| Q2 2007 | 15,987 | 6,545 | 22,532 |
| Q3 2007 | 13,833 | 11,792 | 25,625 |

Table 3 - Interest Expense and Penalties

| Period | ($000's) Originally Reported Interest Expense | Understatement of Interest Expense and Penalties | Restated Interest Expense |
|---|---|---|---|
| 1999 | $13,015 | $3 | $13,018 |
| 2000 | 14,077 | 1,088 | 15,165 |
| 2001 | 16,643 | 2,046 | 18,689 |
| 2002 | 14,331 | 2,515 | 16,846 |
| 2003 | 24,438 | 3,362 | 27,800 |
| 2004 | 20,501 | 3,099 | 23,600 |
| 2005 | 25,950 | 4,047 | 29,997 |
| 2006 | 22,977 | 7,146 | 30,123 |
| Q1 2007 | 5,786 | 4,910 | 10,696 |
| Q2 2007 | 4,848 | 4,911 | 9,759 |
| Q3 2007 | 4,260 | 4,911 | 9,171 |

58.     On or about October 27, 1999, Pall filed its Form 10-K for the fiscal period ended July 31, 1999 with the SEC (the "1999 10-K"). The 1999 10-K reported that Pall's net earnings were $51,507,000, its tax provision was 7,397,000 and its interest expense was $13,015,000. The 1999 10-K was signed by Defendant Krasnoff, CEO, Jeremy Hayward-Surry, Pall's President and Director, Adamovich, Pall's CFO and Treasurer, and Viraj J. Patel, Pall's Chief Accountant (Chief Accounting Officer), among others. The 1999 10-K represented, among other things, that any additional U.S. taxes arising from the repatriation of the "accumulated earnings" of the Company's foreign subsidiaries, including Pall's "Puerto Rico CFC" – i.e., the Puerto Rico branch of Pall's Netherlands subsidiary – were "immaterial." The 1999 10-K stated, in pertinent part, as follows:

> A . . . Puerto Rico entity, initially incorporated under Puerto Rico law in November 1996, has, since August 1998, operated as a branch of a wholly-owned controlled foreign corporation (CFC) of the Company. Under U.S. tax principles, the earnings of a CFC are normally subject to U.S. tax only upon repatriation.

*       *       *

United States income taxes have not been provided on the retained earnings of foreign subsidiaries (including the Puerto Rico CFC referred to above), which totaled $149,000, at July 31, 1999 ($202,000 at August 1, 1998). Foreign subsidiaries have paid, and are expected to continue to pay, dividends out of accumulated earnings. A portion of such earnings will however be permanently reinvested and any additional U.S. taxes arising from the repatriation of earnings available for distribution, less applicable credits for taxes paid abroad, would not be material.

The 1999 10-K also represented that the Company's financial statements complied with GAAP in all material respects, stating, in pertinent part:

To prepare the Company's financial statements in conformity with generally accepted accounting principles, management is required to make estimates and assumptions that may affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

59.    The statements referenced above in ¶58 and were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    that in 1998, Pall's then senior management, including Defendant Krasnoff, had directed that no cash settlement of intercompany balances between Medsep and Pall Netherlands be made in order to divert funds to finance the Company's domestic operations and reduce the Company's domestic borrowing costs. The scheme successfully diverted as much as $677 million over the nine year period ending April 2007;

(b)    that Pall was materially overstating its financial results by understating its liability for income taxes. Pall has publicly reported that it actually owed at least $278 million in taxes – including interest and penalties - and that its financial statements for fiscal years 1999 through 2006 and for each of the fiscal quarters ended October 31, 2006, January 31, 2007 and April 30, 2007 "should no longer be relied upon and that a restatement of some or all of those financial statements will be required";

(c)    that Pall's net earnings were actually $45,543,000 and not $51,507,000 as originally reported, an overstatement of $5,964,000;

(d)    that Pall's tax provision was actually $13,358,000 and not $7,397,000 as originally reported, an understatement of $5,961,000;

(e)    that Pall's interest expense was actually $13,018,000 and not $13,015,000 as originally reported, an understatement of $3,000;

(f)    that the Company's reported effective tax rate was materially inaccurate as the Company was materially understating its tax liability, as it has now admitted; and

(g)    based on the foregoing, the Company's financial statements were not prepared in accordance with GAAP and were, therefore, materially false and misleading as detailed further herein.  (*See* ¶¶97-118).

60.    On or about October 26, 2000, Pall filed its Form 10-K for the fiscal period ended July 29, 2000 with the SEC (the "2000 10-K").  The 2000 10-K reported that Pall's net earnings were $146,636,000, its tax provision was $41,768,000 and its interest expense was $14,077,000. The 2000 10-K was signed by Defendant Krasnoff, CEO, Jeremy Hayward-Surry, Pall's President and Director, Adamovich, Pall's CFO and Treasurer, and Lisa Kobarg, Pall's Chief Accountant (Chief Accounting Officer), among others.  The 2000 10-K represented, among other things, that any additional U.S. taxes arising from the repatriation of the "accumulated earnings" of the Company's foreign subsidiaries, including Pall's "Puerto Rico CFC" – *i.e.*, the Puerto Rico branch of Pall's Netherlands subsidiary – were "immaterial."  The 2000 10-K stated, in pertinent part, as follows:

> [A] . . . Puerto Rico entity [operated] as a branch of a wholly owned controlled foreign corporation ("CFC").  Under U.S. tax principles, the earnings of a CFC are normally subject to U.S. tax only upon repatriation.  Accordingly, no taxes have been provided on the unrepatriated earnings of this subsidiary.

*       *       *

- 23 -

United States income taxes have not been provided on the retained earnings of foreign subsidiaries (including the Puerto Rico CFC referred to above), which totaled $203,000, at July 29, 2000 ($149,000 at July 31, 1999). Foreign subsidiaries have paid, and are expected to continue to pay, dividends out of accumulated earnings. A portion of such earnings will however be permanently reinvested and any additional U.S. taxes arising from the repatriation of earnings available for distribution, less applicable credits for taxes paid abroad, would not be material.

The 2000 10-K also represented that the Company's financial statements complied with GAAP in all material respects, stating, in pertinent part:

To prepare the Company's financial statements in conformity with generally accepted accounting principles, management is required to make estimates and assumptions that may affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

61. The statements referenced above in ¶60 were each materially false and misleading for the reasons stated at ¶59. In addition, the statements in ¶60 were materially false and misleading due to the following reasons:

(a) Pall's net earnings were actually $127,096,000 and not $146,636,000 as originally reported, an overstatement of $19,540,000;

(b) Pall's tax provision was actually $60,220,000 and not $41,768,000 as originally reported, an understatement of $18,452,000; and

(c) Pall's interest expense was actually $15,165,000 and not $14,077,000 as originally reported, an understatement of $1,088,000.

62. On or about October 26, 2001, Pall filed its Form 10-K for the fiscal period ended July 28, 2001 with the SEC (the "2001 10-K"). The 2001 10-K reported that Pall's net earnings were $118,010,000, its tax provision was $32,310,000 and its interest expense was $16,643,000. The 2001 10-K was signed by Defendant Krasnoff, CEO, Jeremy Hayward-Surry, Pall's President and Director, Adamovich, Pall's CFO and Treasurer, and Lisa Kobarg, Pall's Chief Corporate

Accountant, among others.  The 2001 10-K represented, among other things, that the determination of any additional U.S. taxes arising from the repatriation of the "accumulated earnings" of the Company's foreign subsidiaries, including Pall's "Puerto Rico CFC" – *i.e.*, the Puerto Rico branch of Pall's Netherlands subsidiary – was "not practicable."  The 2001 10-K stated, in pertinent part, as follows:

> The Company . . . operates a . . . Puerto Rico entity as a branch of a wholly owned controlled foreign corporation ("CFC").  Under U.S. tax principles, the earnings of a CFC are normally subject to U.S. tax only upon repatriation.  Accordingly, no taxes have been provided on the unrepatriated earnings of this subsidiary.
>
> *          *          *
>
> United States income taxes have not been provided on the retained earnings of foreign subsidiaries (including the Puerto Rico CFC referred to above), which totaled $249,000 and $203,000 at July 28, 2001 and July 29, 2000, respectively.
>
> Foreign subsidiaries have paid, and are expected to continue to pay, dividends out of accumulated earnings.  A portion of such earnings will be permanently reinvested and the determination of any additional U.S. tax arising from the repatriation of earnings available for distribution is not practicable.

The 2001 10-K also represented that the Company's financial statements complied with GAAP in all material respects, stating, in pertinent part:

> To prepare the Company's consolidated financial statements in accordance with generally accepted accounting principles, management is required to make assumptions that may affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Estimates are used for, but not limited to, inventory valuation; provisions for doubtful accounts; asset impairment; depreciable lives of fixed assets and useful lives of patents and goodwill; fair value of financial instruments; income tax assets and liabilities; pension valuations; restructuring and other charges; and the liability for environmental remediation.  The Company is subject to uncertainties such as the impact of future events, economic, environmental and political factors, and changes in the business climate, therefore actual results may differ from those estimates. Accordingly, the accounting estimates used in the preparation of the Company's consolidated financial statements will change as new events occur, as more experience is acquired, as additional information is obtained and as the Company's operating environment changes.  Changes in estimates are made when circumstances warrant.  Such changes and refinements in estimation methodologies are reflected in

reported results of operations and, if material, the effects of changes in estimates are disclosed in the notes to the consolidated financial statements.

63.     The statements referenced above in ¶62 were each materially false and misleading for the reasons stated at ¶59.  In addition, the statements in ¶62 were materially false and misleading due to the following reasons:

(a)     that Pall's net earnings were actually $99,230,000 and not $118,010,000 as originally reported, an overstatement of $18,780,000;

(b)     that Pall's tax provision was actually $49,044,000 and not $32,310,000 as originally reported, an understatement of $16,734,000; and

(c)     that Pall's interest expense was actually $18,689,000 and not $16,643,000 as originally reported, an understatement of $2,046,000.

64.     On or about October 25, 2002, Pall filed its Form 10-K for the fiscal period ended August 3, 2002 with the SEC (the "2002 10-K").  The 2002 10-K reported that Pall's net earnings were $73,234,000, its tax provision was $26,741,000 and its interest expense was $14,331,000.  The 2002 10-K was signed by Defendant Krasnoff CEO, Jeremy Hayward-Surry, Pall's President and Director, Adamovich, Pall's CFO and Treasurer, and Lisa Kobarg, Pall's Chief Corporate Accountant, among others.  The 2002 10-K represented, among other things, that the determination of any additional U.S. taxes arising from the repatriation of the "accumulated earnings" of the Company's foreign subsidiaries, including Pall's "Puerto Rico CFC" – *i.e.*, the Puerto Rico branch of Pall's Netherlands subsidiary – was "not practicable."  The 2002 10-K stated, in pertinent part, as follows:

> The Company . . . operates a . . . Puerto Rico entity as a branch of a wholly owned controlled foreign corporation ("CFC").  Under U.S. tax principles, the earnings of a CFC are normally subject to U.S. tax only upon repatriation.  Accordingly, no taxes have been provided on the unrepatriated earnings of this subsidiary.

*        *        *

- 26 -

United States income taxes have not been provided on the retained earnings of foreign subsidiaries (including the Puerto Rico CFC referred to above), which totaled $327,000 and $249,000 at August 3, 2002, and July 28, 2001, respectively.

Foreign subsidiaries have paid, and are expected to continue to pay, dividends out of current earnings.  A portion of such earnings will be permanently reinvested and the determination of any additional U.S. tax arising from the repatriation of earnings available for distribution is not practicable.

The 2002 10-K also represented that the Company's financial statements complied with GAAP in all material respects, stating, in pertinent part:

To prepare the Company's consolidated financial statements in accordance with generally accepted accounting principles, management is required to make assumptions that may affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Estimates are used for, but not limited to, inventory valuation; provisions for doubtful accounts; asset impairment; depreciable lives of fixed assets and useful lives of patents and amortizable intangibles; fair value of financial instruments; income tax assets and liabilities; pension valuations; restructuring and other charges; valuation of assets acquired and liabilities assumed in business combinations; and liabilities for environmental remediation.  The Company is subject to uncertainties such as the impact of future events, economic, environmental and political factors, and changes in the business climate; therefore, actual results may differ from those estimates. Accordingly, the accounting estimates used in the preparation of the Company's consolidated financial statements will change as new events occur, as more experience is acquired, as additional information is obtained and as the Company's operating environment changes.  Changes in estimates are made when circumstances warrant.  Such changes and refinements in estimation methodologies are reflected in reported results of operations; if material, the effects of changes in estimates are disclosed in the notes to the consolidated financial statements.

Certain prior year amounts have been reclassified to conform to the current year presentation.

65.     The statements referenced above in ¶64 were each materially false and misleading for the reasons stated at ¶59.  In addition, the statements in ¶64 were materially false and misleading due to the following reasons:

(a)     Pall's net earnings were actually $44,839,000 and not $73,234,000 as originally reported, an overstatement of $28,395,000;

(b)      Pall's tax provision was actually $52,621,000 and not $26,741,000 as originally reported, an understatement of $25,880,000; and

(c)      Pall's interest expense was actually $16,846,000 and not $14,331,000 as originally reported, an understatement of $2,515,000.

66.      On or about October 22, 2003, Pall filed its Form 10-K for the fiscal period ended August 2, 2003 with the SEC (the "2003 10-K"). The 2003 10-K reported that Pall's net earnings were $103,202,000, its tax provision was $40,034,000 and its interest expense was $24,438,000. The 2003 10-K was signed by Defendant Krasnoff, CEO, Wilson, Pall's President and Director, Adamovich, Pall's CFO and Treasurer, and Defendant McDermott, Pall's Chief Accountant, among others. The 2003 10-K represented, among other things, that the determination of any additional U.S. taxes arising from the repatriation of the "accumulated earnings" of the Company's foreign subsidiaries, including Pall's "Puerto Rico CFC" – *i.e.*, the Puerto Rico branch of Pall's Netherlands subsidiary – was "not practicable." The 2003 10-K stated, in pertinent part, as follows:

> The Company . . . operates a . . . Puerto Rico entity as a branch of a wholly owned controlled foreign corporation ("CFC"). Under U.S. tax principles, the earnings of a CFC are normally subject to U.S. tax only upon repatriation. Accordingly, no taxes have been provided on the unrepatriated earnings of this subsidiary.

> *      *      *

> United States income taxes have not been provided on the retained earnings of foreign subsidiaries (including the Puerto Rico CFC referred to above), which totaled $412,195 and $326,802 at August 2, 2003, and August 3, 2002, respectively.

> Foreign subsidiaries have paid, and are expected to continue to pay, dividends out of current earnings. A portion of such earnings will be permanently reinvested and the determination of any additional U.S. tax arising from the repatriation of earnings available for distribution is not practicable.

The 2003 10-K also represented that the Company's financial statements complied with GAAP in all material respects, stating, in pertinent part:

- 28 -

To prepare the Company's consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, management is required to make assumptions that may affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Estimates are used for, but not limited to, inventory valuation; provisions for doubtful accounts; asset impairment; depreciable lives of fixed assets and useful lives of patents and amortizable intangibles; fair value of financial instruments; income tax assets and liabilities; pension valuations; restructuring and other charges; valuation of assets acquired and liabilities assumed in business combinations; and liabilities for environmental remediation. The Company is subject to uncertainties such as the impact of future events, economic, environmental and political factors, and changes in the business climate; therefore, actual results may differ from those estimates. Accordingly, the accounting estimates used in the preparation of the Company's consolidated financial statements will change as new events occur, as more experience is acquired, as additional information is obtained and as the Company's operating environment changes. Changes in estimates are made when circumstances warrant. Such changes and refinements in estimation methodologies are reflected in reported results of operations; if material, the effects of changes in estimates are disclosed in the notes to the consolidated financial statements.

67.     The statements referenced above in ¶66 were each materially false and misleading for the reasons stated at ¶59. In addition, the statements in ¶66 were materially false and misleading due to the following reasons:

(a)     Pall's net earnings were actually $82,974,000 and not $103,202,000 as originally reported, an overstatement of $20,228,000;

(b)     Pall's tax provision was actually $56,900,000 and not $40,034,000 as originally reported, an understatement of $16,866,000; and

(c)     Pall's interest expense was actually $27,800,000 and not $24,438,000 as originally reported, an understatement of $3,362,000.

68.     On or about October 13, 2004, Pall filed its Form 10-K for the fiscal period ended July 31, 2004 with the SEC (the "2004 10-K"). The 2004 10-K reported that Pall's net earnings were $151,573,000, its tax provision was $46,259,000 and its interest expense was $20,501,000. The 2004 10-K was signed by Defendant Krasnoff, CEO, Wilson, Pall's President and Director,

- 29 -

Adamovich, Pall's CFO and Treasurer, and Defendant McDermott, Pall's Chief Accounting Officer,

among others.  The 2004 10-K represented, among other things, that the determination of any

additional U.S. taxes arising from the repatriation of the "accumulated earnings" of the Company's

foreign subsidiaries, including Pall's "Puerto Rico CFC" – *i.e.*, the Puerto Rico branch of Pall's

Netherlands subsidiary – was "not practicable."  The 2004 10-K stated, in pertinent part, as follows:

> The Company . . . operates a . . . Puerto Rico entity as a branch of a wholly owned
> controlled foreign corporation ("CFC").  Under U.S. tax principles, the earnings of a
> CFC are normally subject to U.S. tax only upon repatriation.  Accordingly, no taxes
> have been provided on the unrepatriated earnings of this subsidiary.
>
> *          *          *
>
> United States income taxes have not been provided on the undistributed earnings of
> foreign subsidiaries (which totaled $992,459 at July 31, 2004) since substantially all
> such earnings are expected to be permanently invested in foreign operations.
> Dividend distributions in excess of current earnings or the sale or other disposition of
> an investment in a foreign subsidiary would cause temporary differences related to
> undistributed earnings to become taxable.  Determination of a hypothetical deferred
> tax liability, based upon the undistributed earnings of foreign subsidiaries, is not
> practicable due to the indeterminate nature of underlying assumptions.

The 2004 10-K also represented that the Company's financial statements complied with GAAP in all

material respects, stating, in pertinent part:

> To prepare the Company's consolidated financial statements in accordance with
> accounting principles generally accepted in the United States of America,
> management is required to make assumptions that may affect the reported amounts of
> assets and liabilities and the disclosure of contingent assets and liabilities at the date
> of the consolidated financial statements and the reported amounts of revenue and
> expenses during the reporting period.  Estimates are used for, but not limited to,
> inventory valuation; provisions for doubtful accounts; asset impairment; depreciable
> lives of fixed assets and useful lives of patents and amortizable intangibles; fair value
> of financial instruments; income tax assets and liabilities; pension valuations;
> restructuring and other charges; valuation of assets acquired and liabilities assumed
> in business combinations; and liabilities for items such as environmental
> remediation.  The Company is subject to uncertainties such as the impact of future
> events, economic, environmental and political factors, and changes in the business
> climate; therefore, actual results may differ from those estimates.  When no estimate
> in a given range is deemed to be better than any other when estimating contingent
> liabilities, the low end of the range is accrued.  Accordingly, the accounting estimates
> used in the preparation of the Company's consolidated financial statements will

- 30 -

change as new events occur, as more experience is acquired, as additional information is obtained and as the Company's operating environment changes. Changes in estimates are made when circumstances warrant. Such changes and refinements in estimation methodologies are reflected in reported results of operations; if material, the effects of changes in estimates are disclosed in the notes to the consolidated financial statements.

69. The statements referenced above in ¶68 were each materially false and misleading for the reasons stated at ¶59. In addition, the statements in ¶68 were materially false and misleading due to the following reasons:

(a) Pall's net earnings were actually $123,733,000 and not $151,573,00 as originally reported, an overstatement of $27,840,000;

(b) Pall's tax provision was actually $71,000 and not $46,259,000 as originally reported, an understatement of $24,741,000; and

(c) Pall's interest expense was actually $23,600 and not $20,501,000 as originally reported, an understatement of $3,099.

70. On or about October 14, 2005, Pall filed its Form 10-K for the fiscal period ended July 31, 2005 with the SEC (the "2005 10-K"). The 2005 10-K reported that Pall's net earnings were $140,816,000, its tax provision was $40,255,000 and its interest expense was $25,950,000. The 2005 10-K was signed by Defendant Krasnoff, CEO, Wilson, Pall's CFO and Treasurer, and Defendant McDermott, Pall's Chief Accounting Officer, among others. The 2005 10-K represented, among other things, that the Company had examined the repatriation of foreign subsidiaries accumulated earnings, including Pall's "Puerto Rico CFC" – i.e., the Puerto Rico branch of Pall's Netherlands subsidiary – and determined that the Company could repatriate up to $500 million in foreign earnings, incurring taxes of $26 million. The 2005 10-K stated, in pertinent part, as follows:

The Company . . . operates a . . . Puerto Rico entity as a branch of a wholly owned controlled foreign corporation ("CFC"). Under U.S. tax principles, the earnings of a CFC are normally subject to U.S. tax only upon repatriation. Accordingly, no taxes have been provided on the unrepatriated earnings of this subsidiary.

- 31 -

\*      \*      \*

On October 22, 2004, the American Jobs Creation Act of 2004 (the "Act") was signed into law.  The Act provides for a special one-time tax deduction of 85% of certain foreign earnings that are repatriated, as defined in the Act.  As of July 31, 2005, the Company has not provided deferred taxes on $1,036,983 of undistributed foreign subsidiaries' earnings since substantially all such earnings were expected to be permanently invested in foreign operations.  The range of reasonably possible amounts, based upon the law, that are being considered for repatriation due to the aforementioned provision is between zero and $500,000.  The related potential range of income tax is between zero and $26,250.  The extent to which the Company will ultimately take advantage of this provision depends on a number of factors, including the manner in which the funds will be utilized and the ability to obtain financing abroad.

The 2005 10-K also represented that the Company's financial statements complied with GAAP in all material respects, stating, in pertinent part:

To prepare the Company's consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, management is required to make assumptions that may affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period.  Estimates are used for, but not limited to, inventory valuation; provisions for doubtful accounts; asset impairment; depreciable lives of fixed assets and useful lives of patents and amortizable intangibles; fair value of financial instruments; income tax assets and liabilities; pension valuations; restructuring and other charges; valuation of assets acquired and liabilities assumed in business combinations; revenue recognition and liabilities for items such as environmental remediation.  The Company is subject to uncertainties such as the impact of future events, economic, environmental and political factors, and changes in the business climate; therefore, actual results may differ from those estimates.  When no estimate in a given range is deemed to be better than any other when estimating contingent liabilities, the low end of the range is accrued.  Accordingly, the accounting estimates used in the preparation of the Company's consolidated financial statements will change as new events occur, as more experience is acquired, as additional information is obtained and as the Company's operating environment changes.  Changes in estimates are made when circumstances warrant.  Such changes and refinements in estimation methodologies are reflected in reported results of operations; if material, the effects of changes in estimates are disclosed in the notes to the consolidated financial statements.

71.     The statements referenced above in ¶70 were each materially false and misleading for the reasons stated at ¶59.  In addition, the statements in ¶70 were materially false and misleading due to the following reasons:

(a)     Pall's net earnings were actually $113,703,000 and not $140,816,000 as originally reported, an overstatement of $27,113,000;

(b)     Pall's tax provision was actually $63,321,000 and not $40,255,000 as originally reported, an understatement of $23,066,000; and

(c)     Pall's interest expense was actually $29,997,000 and not $25,950,000 as originally reported, an understatement of $4,047,000.

72.     On or about October 13, 2006, Pall its Form 10-K for the fiscal period ended July 31, 2006 with the SEC (the "2006 10-K").  The 2006 10-K reported that Pall's net earnings were $145,493,000, its tax provision was $64,883,000 and its interest expense was $22,977,000.  The 2006 10-K was signed by Defendant Krasnoff, CEO, Wilson, Pall's President and Director, Adamovich, Pall's CFO and Treasurer, and Defendant McDermott, Pall's Chief Accountant, among others.  The 2006 10-K represented, among other things, that the Company had examined the repatriation of foreign subsidiaries accumulated earnings, including Pall's "Puerto Rico CFC" – *i.e.*, the Puerto Rico branch of Pall's Netherlands subsidiary – and reported that the Company repatriated $398 million in foreign earnings, incurring taxes of $17 million.  The 2006 10-K stated, in pertinent part, as follows:

> The Company has two Puerto Rico subsidiaries that are organized as "possessions corporations" as defined in Section 936 of the Internal Revenue Code.  The Small Business Job Protection Act of 1996 repealed Section 936 of the Internal Revenue Code which provided a tax credit for U.S. companies with operations in certain U.S. possessions, including Puerto Rico.
>
> For Pall Corporation, the repeal was effective July 31, 2006.  The Company has formed a Puerto Rico Limited Liability Company ("LLC"), which purchased the assets and operations of the two Section 936 companies effective July 31, 2006.  The

LLC is a subsidiary of a wholly-owned controlled foreign corporation ("CFC"). The Company also operates another Puerto Rico entity as a branch of this wholly-owned CFC.

Under U.S. tax principles, the earnings of a CFC are normally subject to U.S. tax only upon repatriation. Accordingly, no taxes have been provided on the unrepatriated earnings of this subsidiary.

*     *     *

On October 22, 2004, the American Jobs Creation Act of 2004 (the "Act") was signed into law. The Act provided for a special one-time tax deduction of 85% of certain foreign earnings that are repatriated, as defined in the Act. During the fourth quarter of fiscal year 2006, the Company completed the repatriation of foreign earnings through intercompany dividends in the amount of $398,000 under the provisions of the Act. This action resulted in an incremental tax charge of approximately $17,000.

The 2006 10-K also represented that the Company's financial statements complied with GAAP in all

material respects, stating, in pertinent part:

To prepare the Company's consolidated financial statements in accordance with U.S. generally accepted accounting principles, management is required to make assumptions that may affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Estimates are used for, but not limited to, inventory valuation; provisions for doubtful accounts; asset recoverability; depreciable lives of fixed assets and useful lives of patents and amortizable intangibles; fair value of financial instruments; income tax assets and liabilities; pension valuations; restructuring and other charges; valuation of assets acquired and liabilities assumed in business combinations; allocation to market segments; revenue recognition and liabilities for items such as environmental remediation. The Company is subject to uncertainties such as the impact of future events, economic, environmental and political factors, and changes in the business climate; therefore, actual results may differ from those estimates. When no estimate in a given range is deemed to be better than any other when estimating contingent liabilities, the low end of the range is accrued. Accordingly, the accounting estimates used in the preparation of the Company's consolidated financial statements will change as new events occur, as more experience is acquired, as additional information is obtained and as the Company's operating environment changes. Changes in estimates are made when circumstances warrant. Such changes and refinements in estimation methodologies are reflected in reported results of operations; if material, the effects of changes in estimates are disclosed in the notes to the consolidated financial statements.

73.     The statements referenced above in ¶72 were each materially false and misleading for the reasons stated at ¶59.  In addition, the statements in ¶72 were materially false and misleading due to the following reasons:

(a)     Pall's net earnings were actually $52,140,000 and not $145,493,000 as originally reported, an overstatement of $93,353,000;

(b)     Pall's tax provision was actually $151,090,000 and not $64,883,000 as originally reported, an understatement of $86,207,000; and

(c)     Pall's interest expense was actually $30,123,000 and not $22,977,000 as originally reported, an understatement of $7,146,000.

74.     On or about December 11, 2006, Pall filed its Form 10-Q with the SEC for its fiscal first quarter of 2007, the period ended October 31, 2006 (the "First Quarter 10-Q"), which was signed by Defendant McDermott.  The First Quarter 10-Q reported that Pall's net earnings were $24,434,000, its income tax provision was $4,755,000, and its interest expense was $5,786,000.  The First Quarter 10-Q reported that the Company's effective tax rate  was 24% and represented that Pall's financial statements complied with GAAP in all material respects, stating, in pertinent part, as follows:

> The condensed consolidated financial information included herein is unaudited.
> Such information reflects all adjustments of a normal recurring nature, which are, in
> the opinion of Company management, necessary to present fairly the Company's
> consolidated financial position, results of operations and cash flows as of the dates
> and for the periods presented herein.

75.     The statements referenced above in ¶74 were each materially false and misleading for the reasons stated at ¶59.  In addition, the statements in ¶74 were materially false and misleading due to the following reasons:

(a)     Pall's net earnings were actually $16,001,000 and not $24,434,000 as originally reported, an overstatement of $8,433,000;

(b)      Pall's tax provision was actually $8,278,000 and not $4,755,000 as originally reported, an understatement of $3,523,000; and

(c)      Pall's interest expense was actually $10,696,000 and not $5,786,000 as originally reported, an understatement of $7,146,000.

76.      On or about March 9, 2007, Pall filed its Form 10-Q with the SEC for its fiscal second quarter of 2007, the period ended January 31, 2007 (the "Second Quarter 10-Q"), which was signed by Defendant McDermott.  The Second Quarter 10-Q reported that Pall's net earnings were $55,803,000, its income tax provision was $15,987,000, and its interest expense was $4,848,000. The Second Quarter 10-Q reported that the Company's effective tax rate was 24% and represented that Pall's financial statements complied with GAAP in all material respects, stating, in pertinent part, as follows:

> The condensed consolidated financial information included herein is unaudited. Such information reflects all adjustments of a normal recurring nature, which are, in the opinion of Company management, necessary to present fairly the Company's consolidated financial position, results of operations and cash flows as of the dates and for the periods presented herein.

77.      The statements referenced above in ¶76 were each materially false and misleading for the reasons stated at ¶59.  In addition, the statements in ¶76 were materially false and misleading due to the following reasons:

(a)      Pall's net earnings were actually $44,347,000 and not $55,803,000 as originally reported, an overstatement of $11,546,000;

(b)      Pall's tax provision was actually $22,532,000 and not $15,987,000 as originally reported, an understatement of $6,545,000; and

(c)      Pall's interest expense was actually $9,759,000 and not $4,848,000 as originally reported, an understatement of $4,911,000.

**Materially False and Misleading**
**Statements Issued During the Class Period**

78.     The Class Period begins on April 20, 2007.  On that date, the price of Pall common

stock was $40.40 per share.

79.     On May 31, 2007, Pall issued a press release announcing its financial results for the

fiscal third quarter of 2007, the period ended April 30, 2007.  For the quarter, the Company reported

net earnings of $67.1 million, income tax provision of $13,833,000 and interest expense of

$4,260,000.  Defendant Krasnoff commented on the results, stating, in pertinent part, as follows:

> Execution of our strategic plan is driving improvements to the top and bottom line.
> Pall's Total Fluid Management(sm) value proposition is resonating with customers.
> The benefits from pricing, productivity improvement and cost reduction initiatives
> have driven operating profit growth of 35%.
>
> Pall's broad cost reduction initiatives were a major contributor to the gross margin
> expansion to 49.5%.  Continued improvement in the profitability of systems played a
> key role.  We are on track to achieve further gross margin expansion in fiscal 2008 as
> our cost reduction and facilities rationalization initiatives continue to gain traction.
> Selling, general and administrative ("S,G&A") expenses again decreased as a
> percentage of sales falling to 30%.

With regard to the Company's outlook, Defendant Krasnoff stated:

> For the full fiscal year, we expect Life Sciences to achieve mid single-digit sales
> growth with Medical on the low end and BioPharmaceuticals around 10%.  Pall
> Industrial should come in near the top end of the 5-7% growth range provided at the
> beginning of the fiscal year reflecting a slowdown in the Microelectronics market
> offset by the vitality of systems sales and the Energy marketplace generally.  This
> adds up to low revenue growth in the fourth quarter over a very strong fourth quarter
> in fiscal 2006.
>
> Our expectations for the full year are for gross margins for the Company to stabilize
> as the impact of our cost reduction initiatives grow.  S,G&A is expected to be about
> 30% of sales.  Our underlying tax rate is expected to be between 24 and 25%
> excluding the effects of favorable income tax related adjustments.
>
> At mid-year we shared an expectation that earnings would modestly exceed prior
> guidance.  Now with three quarters in the books, we expect to finish the year with
> strong earnings.

80.     On or about June 8, 2007, Pall filed its Form 10-Q with the SEC for its fiscal third

quarter of 2007, the period ended April 30, 2007 (the "Third Quarter 10-Q"), which was signed by

Defendant McDermott and confirmed the previously announced financial results.  With respect to

the Company's effective tax rate, the Third Quarter 10-Q stated, in pertinent part, as follows:

> The Company's effective tax rate for the nine months ended April 30, 2007 and 2006
> was 19.0% and 36.5%.  The decrease in the effective tax rate was primarily due to
> the refinement of prior estimates of income tax liabilities, including amounts relating
> to the repatriation of foreign subsidiary earnings, as well as the availability of
> research credits in both the United States of America and the United Kingdom.  In
> addition, the Company recorded tax expense of $17,000 during the nine months
> ended April 30, 2006 related to the tax effect of the repatriation of foreign subsidiary
> earnings.
>
> The Company's effective tax rate may change year to year based on recurring factors
> such as the geographical mix of income in tax jurisdictions that have a broad range of
> enacted tax rates, the timing and amount of foreign dividends, state and local taxes,
> the ratio of permanent items to pretax book income and the implementation of
> various global tax strategies, as well as nonrecurring factors.

With respect to the financial statements contained therein, the Third Quarter 10-Q represented that:

> The condensed consolidated financial information included herein is unaudited.
> Such information *reflects all adjustments of a normal recurring nature*, which are,
> in the opinion of Company management, *necessary to present fairly* the Company's
> consolidated financial position, results of operations and cash flows as of the dates
> and for the periods presented herein.   These condensed consolidated financial
> statements should be read in conjunction with the consolidated financial statements
> and notes set forth in the Company's Annual Report on Form 10-K for the fiscal year
> ended July 31, 2006 ("2006 Form 10-K").  [Emphasis added.]

81.     The statements referenced above in ¶80 were each materially false and misleading for

the reasons stated at ¶59.  In addition, the statements in ¶80 were materially false and misleading due

to the following reasons:

(a)     Pall's net earnings were actually $50,371,000 and not $67,074,000 as

originally reported, an overstatement of $16,703,000;

(b)     Pall's tax provision was actually $25,625,000 and not $13,833,000 as

originally reported, an understatement of $11,792,000; and

(c)     Pall's interest expense was actually $9,171,000 and not $4,260,000 as originally reported, an understatement of $4,911,000.

82.     On July 19, 2007, after the markets closed, Pall issued a press release announcing that the Audit Committee of its Board of Directors had commenced an inquiry into a possible material understatement of U.S. income tax payments and of its provision for income taxes in certain prior periods beginning with fiscal year ended July 31, 1999.  According to the press release, the tax issues related to the taxation of certain indebtedness of the Company to a foreign subsidiary.  The press release stated, in pertinent part, as follows:

> The matter relates to the taxation of certain indebtedness of the Company to a foreign subsidiary of the Company.  The Company has notified the Internal Revenue Service and the Securities and Exchange Commission of this matter and of the Audit Committee's pending inquiry.  This matter may also have resulted in the Company's failure to comply with certain terms of its debt or other agreements.  The Company may need to seek waivers under those agreements, including to effectuate its intention to declare a quarterly dividend for the quarter ending July 31, 2007.  The Company intends to report on the Audit Committee's inquiry as soon as practicable.

83.     In response to this announcement, the price of Pall common stock declined from $48.78 per share to $41.11 per share, over 15%, on unusually high trading volume.

84.     Then, on August 2, 2007, Pall issued a press release announcing that its financial statements for fiscal years 1999 through 2006 and for each of the fiscal quarters ended October 31, 2006, January 31, 2007, and April 30, 2007 "should no longer be relied upon and that a restatement of some or all of those financial statements will be required."  Furthermore, Pall reported that the Company could owe up to $130 million in back taxes, not including interest and penalties.  The press release stated, in pertinent part, as follows:

> The amount of the understatement has not yet been finally determined, but is *material* and relates to the taxation of certain intercompany payable balances that mainly resulted from sales of products by a foreign subsidiary of the Company to a U.S. subsidiary of the Company.  Under the Internal Revenue Code, these unpaid balances may have given rise to deemed dividend income to the Company that was not properly taken into account in the Company's U.S. income tax return and

- 39 -

provision for income taxes.  The Company has not finally determined the impact on the Company's provision for income taxes in any affected period, but it will vary from period to period depending on the size of the intercompany payable balances at the end of the affected fiscal quarters, among other factors.  The Company's tax liability will include the amount of taxes that would have been payable with respect to any deemed dividend income in the affected periods, as well as interest on overdue amounts of taxes payable and penalties that may be assessed by the Internal Revenue Service on the eventual resolution of this matter.  The Company cannot predict when its tax liability will be finally determined or whether additional matters will be identified in connection with the ongoing inquiry of the Audit Committee.  ***The Company believes, however, that taxes payable with respect to the intercompany payable balances described above could be in excess of $130 million, exclusive of interest and penalties.***  The Company also believes that, as a result of these circumstances, ***it may have one or more material weaknesses in its internal control over financial reporting***.

As previously reported, this matter may also have resulted in the Company's failure to comply with certain terms of its debt and other agreements, and the Company plans to work with its lenders to seek waivers under those agreements as necessary. [Emphasis added.]

85.    In response to this announcement, the price of Pall common stock fell from $41.11 per share to $39.90 per share, or 3%, on heavy trading volume.

86.    On August 9, 2007, *Thomson Financial News Super Focus* published an article stating that Standard & Poor's Ratings Services lowered its investment rating for Pall in reaction to the Company's announcement of U.S. income tax underpayments.  The article stated, in pertinent part, as follows:

Standard & Poor's Ratings Services cut its ratings on Pall Corp after the filter and purifier maker disclosed that taxes payable could be in excess of 130 mln usd and that it may have one or more weaknesses in its controls over financial reporting.  Pall Corp has been investigating the understatement of its income tax payments and its provision for income taxes for fiscal years dating back to 1999.

The rating agency said the downgrade also reflects the significance of the issue, the unreliability of previous financial statements, the risk of noncompliance with various lending agreements and uncertainty over the cause of the matter.

Although S&P expects Pall's cash balance and cash flow generation to be sufficient to meet estimated tax payments, the maintenance of the negative watch status on the company reflects the potential for a further multiple-notch downgrade if its liquidity position deteriorates.

S&P cut its corporate credit rating on Pall to 'BBB' from 'A-' and the short-term credit rating to 'A-3' from 'A-2'.

87.     In reaction to this news, Pall common stock fell an additional 4%, closing at $37.82 per share on August 9, 2007, down $1.64 per share from the previous close of $39.46 on August 8, 2008.

88.     On January 29, 2008, Pall issued a press release announcing that the Audit Committee inquiry into its underpayment of U.S. income taxes was concluded.  Among other findings, the Company stated that the underpayments had resulted from the intercompany sales of products from a branch of Pall Netherlands, a Dutch company, to Medsep, a Delaware company, two entities directly or indirectly owned or controlled by Pall.  The Company also announced that four "tax and treasury" employees involved in the transaction had been terminated.  The Company further announced that the SEC and U.S. Attorney's Office were conducting inquiries into the matter.  The press release stated, in pertinent part:

> . . . the Audit Committee of [Pall's] Board of Directors, with the assistance of independent counsel, has completed its inquiry with respect to Pall's previously announced understatement of its U.S. federal income tax payments and of its provision for income taxes.
>
> As previously announced, Pall concluded that its annual and quarterly financial statements for the fiscal years 1999 through 2006 and for each of the fiscal quarters ended October 31, 2006, January 31, 2007, and April 30, 2007 should no longer be relied upon and that a restatement of some or all of those financial statements will be required.  This conclusion resulted from the Company's previously announced understatement of U.S. federal income tax payments and of its provision for income taxes relating to the taxation of certain intercompany balances.  ***In particular, the Company discovered intercompany balances that resulted mainly from sales of products by a branch of Pall Netherlands BV, a Dutch company, for substantially all of the period in question, to Medsep Corporation, a Delaware company.  The accrual of these intercompany balances began in fiscal 1999 and continued through management's discovery of this matter in the fourth quarter of fiscal 2007 and gave rise to deemed dividend income to the Company under Section 956 of the Internal Revenue Code***, which was not properly taken into account in its U.S. federal income tax returns and provision for income taxes for the relevant periods.

- 41 -

***On January 25, 2008, Pall terminated the employment of four employees who previously had been placed on administrative leave.*** These employees had principal responsibility for tax and treasury matters during substantially all of the period under review.  None of them was at any time an officer of Pall Corporation.

Management has not determined the impact of this matter on Pall's financial statements for any affected period, and expects that the impact will vary from period to period depending on the size of the intercompany balances at the end of the affected fiscal quarters, among other factors.  The amount of the Company's tax liability will include the amount of taxes that would have been due with respect to any deemed dividend income in each period, interest on overdue amounts of taxes payable and penalties that may be assessed by the Internal Revenue Service on the eventual resolution of this matter.  As previously reported, Pall believes that taxes payable with respect to the intercompany balances described above could be in excess of $130 million, exclusive of interest and penalties.  In September 2007, Pall deposited $135 million with the Internal Revenue Service, virtually all of which relates to this matter, excluding penalties (which may be material).  Pall cannot predict when it will reach a final resolution of its tax liability with the Internal Revenue Service.  The Company also believes that, as a result of these circumstances, it may have one or more material weaknesses in its internal control over financial reporting.

***In addition to the pending audit of this matter by the Internal Revenue Service, the SEC and the United States Attorney's Office also are conducting inquiries into this matter, which could also result in fines, penalties or other relief.***  Pall is cooperating with these inquiries.  The Company, its directors and certain of its officers are also subject to pending civil actions, which allege (among other matters) violations of the U.S. securities laws and breaches of fiduciary duties.

Because Pall has not yet determined the impact of this matter on its financial statements for the affected periods, it cannot predict when its pending restatement will be completed or the impact on its provision for income taxes in any such period. Eric Krasnoff, Chairman and CEO, stated, "As we continue to cooperate with the authorities, we also remain focused on completing our restatement as soon as practicable."  [Emphasis added.]

89.     On March 28, 2008, Pall filed its Form 10-K with the SEC for the period ended July 31, 2007 (the "2007 10-K").  The 2007 10-K included restated financial statements for the nine year period through April, 30, 2007.  The cumulative estimated impact of Defendants' fraud over the nine year period caused an understatement of income tax liabilities of $237 million, as well as additional charges of $41 million for penalties and interest.  The 2007 10-K further acknowledged that Pall had

not reached a final settlement with either U.S. or foreign tax authorities, which could result in additional penalties of $124 million, stating, in pertinent part, as follows:

> The actual amounts due and payable upon final settlement of these matters with the U.S. taxing authorities and other taxing jurisdictions may differ materially from the Company's estimate.  In particular, ***the Company may be subject to potential additional penalties that may be asserted by the U.S. and foreign taxing authorities of up to $124,000, which has not been reflected in the consolidated financial statements as of July 31, 2007.***  [Emphasis added.]

90.     The 2007 10-K also described the events underlying the restatement, stating, in pertinent part:

> In particular, ***the Company discovered various intercompany balances, some of which were in existence throughout the period in question, that resulted mainly from sales of products by a branch of Pall Netherlands BV, a Dutch company, to Medsep Corporation, a Delaware company.  These intercompany balances were not settled in a timely manner and gave rise to deemed dividend income to the Company under the Internal Revenue Code, which was not properly taken into account in its U.S. federal income tax returns and provision for income taxes for the relevant periods.***  In addition, the Company discovered certain other lesser tax compliance matters, some of which were related to intercompany balances and some of which were related to other intercompany transactions.  ***The Company's tax liability and provision for income taxes for the affected periods were therefore understated for the amount of taxes that would have been payable with respect to these tax compliance matters in those periods, as well as interest on overdue amounts of taxes payable and penalties that may be assessed by the U.S. tax authorities and other taxing jurisdictions.***
>
> *            *            *
>
> In September 2007, the Company deposited $135,000 with the U.S. Treasury based on the estimated understatement of U.S. income tax payments, including estimated interest, but excluding potential penalties.  ***In January 2008, the Company also terminated the employment of four employees who previously had been placed on administrative leave as a result of this matter and who had principal responsibility for tax and treasury matters during substantially all of the affected period.***  [Emphasis added.]

91.     The 2007 10-K further revealed that the amount of the intercompany payable balance giving rise to the Pall's "deemed dividend" from Pall Netherlands was in excess of $398 million.  This is a critical fact in supporting Lead Plaintiff's allegation that Defendants were highly motivated

- 43 -

to commit the fraud in order to provide "tax-free" funding for the Company's domestic operations.

The 2007 10-K stated, in pertinent part, as follows:

> In the fourth quarter of fiscal year 2006, the Company repatriated $398,000 of foreign earnings in a plan intended to benefit from the American Jobs Creation Act of 2004, also known as the Homeland Investment Act (the "HIA"). The HIA provided a one-time incentive for U.S. corporations to repatriate accumulated income earned abroad by providing an 85% dividends received deduction for certain dividends from controlled foreign corporations, such as the branch of Pall Netherlands BV that was owed amounts under the intercompany balances that resulted in the restatement. ***In conjunction with the restatement process, the Company concluded that it was not entitled to any benefit under the HIA as the deemed dividends resulting from the intercompany payable balances underlying the restatement created a balance of "previously taxed income" that could be repatriated without any additional U.S. federal income tax regardless of the HIA. The repatriation of that previously taxed income, however, caused the section 956 inclusion for 2006 to increase to reflect the relevant intercompany payable balances during the period by virtue of the technical operation of the Internal Revenue Code.*** The restatement reflects the proper accounting for the tax consequences of the intercompany payable balances, one effect of which is the elimination of the $17,000 incremental provision for income taxes previously recorded in fiscal year 2006 associated with the repatriation and the recording of taxes payable in respect of the deemed dividend for the year at the corporate tax rate of 35%. [Emphasis added.]

92.     In addition, the 2007 10-K confirmed that the Company had violated certain debt covenants when it failed to file its fiscal 2007 Form 10-K in October 2007 due to the restatement, stating, in pertinent part:

> This matter resulted in the Company's failure or inability to comply with certain representations, warranties and covenants in its debt and other financing-related agreements, including the Company's obligation to provide certain information (principally the Company's periodic Securities and Exchange Commission ("SEC") reports) to those lenders or counterparties. The Company entered into amendments and/or waivers to address these matters with the lenders or counterparties, as applicable, under its $500,000 unsecured senior revolving credit facility, Yen 9 billion variable-rate loan due June 20, 2010 and certain other debt and financing-related agreements, as well as an amendment of the indenture relating to the $280,000 6% senior notes due August 1, 2012.

93.     Defendants' also admitted to material weaknesses in the Company's disclosure and control procedures and internal control over financial reporting.  The 2007 10-K stated, in pertinent part, as follows:

DISCLOSURE CONTROLS AND PROCEDURES

The Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's chief executive officer and chief financial officer, of the effectiveness of the Company's disclosure controls and procedures as of July 31, 2007.  Based on this evaluation and considering the material weakness in internal control over financial reporting described below relating to the Company's accounting for income taxes, the chief executive officer and chief financial officer concluded that the Company's disclosure controls and procedures were not effective as of such date to ensure that information required to be disclosed in the reports that it files or submits under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms.

The Company has taken remedial action with respect to such material weakness and is continuing to consider the appropriateness of other measures as more fully described below.  In addition, in January 2008, the Company terminated the employment of four employees who previously had been placed on administrative leave as a result of the matter that gave rise to the restatement and who had principal responsibility for tax and treasury matters.

INTERNAL CONTROL OVER FINANCIAL REPORTING

Management conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.  Based on this evaluation, management concluded that the Company's internal control over financial reporting was not effective as of July 31, 2007.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.  The following material weakness was identified as of July 31, 2007: the Company lacked a periodic review to ensure that the income tax impact of certain intercompany transactions were properly considered in the Company's provision for income taxes.  The Company has restated its previously issued consolidated financial statements for each of the eight fiscal years in the period ended July 31, 2006 and for each of the fiscal quarters ended October 31, 2006, January 31, 2007, and April 30, 2007 to correct reported provision for income taxes, interest expense, net, income taxes payable, and deferred income taxes in such consolidated financial statements.

- 45 -

94.     The market for Pall's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Pall's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Pall common stock relying upon the integrity of the market price of Pall's common stock and market information relating to Pall, and have been damaged thereby.

95.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Pall's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

96.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Pall's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Pall and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Pall's Financial Statements During the Class
Period Were Materially False and Misleading**

**Defendants Have Admitted Pall's
Financial Statements Violated GAAP**

97.    On August 2, 2007, Pall announced that that the Company's annual and quarterly

financial statements for the fiscal years 1999 through 2006 and for each of the fiscal quarters ended

October 31, 2006, January 31, 2007 and April 30, 2007 "should no longer be relied upon" and that a

restatement of some or all of those financial statements would be required.[2]

98.    Pall's August 2, 2007 press release revealed that the restatement was, primarily, the

result of correcting Pall's improper accounting for income taxes as alleged herein.  Pall admitted that

its Class Period financial statements understated the Company's U.S. tax liabilities by not accounting

for taxes on "deemed dividend income" related to "certain intercompany payable balances that

mainly resulted from sales of products by a foreign subsidiary of the Company to a U.S. subsidiary

of the Company."   Pall estimated that taxes payable with respect to the intercompany payable

balances described above could be in excess of $130 million, exclusive of interest and penalties.

The Company also admitted that, as a result of the tax understatement, "it may have one or more

material weaknesses in its internal control over financial reporting."

99.    Then ,on March 28, 2008, Pall filed the 2007 10-K.  The 2007 10-K included restated

financial statements for the nine year period through April, 30, 2007.  The cumulative estimated

impact of Defendants' fraud over the nine year period caused an understatement of income tax

liabilities of $237 million, as well as additional charges of $41 million for penalties and interest.  The

_____

[2]      In so doing, Pall has determined that such financial statements were materially misstated
because GAAP provides that only previously issued financial statements which are materially
misstated need to be retroactively restated.  APB Opinion No. 20.

2007 10-K further acknowledged that Pall had not reached a final settlement with either U.S. or foreign tax authorities, which could result in additional penalties of $124 million.

100.    As a result, Defendants' representations that the financial statements Pall issued to investors during the Class Period were each prepared in accordance with GAAP and the accounting and disclosure rules and regulations of the SEC were materially false and misleading.[3]

101.    In truth, and in fact, the representations by Defendants to investors concerning Pall's financial reporting were materially false and misleading when made because, during the Class Period, Pall engaged in a high risk, funds diversion scheme which was deliberately designed to evade U.S. income tax laws.

102.    As alleged more fully herein, Pall's stock price fell, thereby eliminating hundreds of millions of dollars of the Company's market value, when it announced on July 19, 2007, after the markets closed, that Pall's Audit Committee of its Board of Directors had commenced an inquiry into a possible material understatement of U.S. income tax payments and of its provision for income taxes in certain prior periods beginning with fiscal year ended July 31, 1999.

103.    FASB's Statement of Financial Accounting Standards ("SFAS") No. 5, ¶10, creates the duty that financial statements disclose contingencies when it is at least ***reasonably*** possible (defined by the accounting standards to be "a greater than ***slight***" chance) that a loss may have been incurred.[4]   GAAP provides that the financial statement disclosure shall indicate the nature of the

---

[3]    Generally accepted auditing standard ("GAAS") §AU 411.02 defines GAAP as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

[4]    SFAS No. 5 defines "contingency" as an existing condition, situation or set of circumstances involving an uncertainty as a possible gain or loss.

contingency and shall give an estimate of the possible loss, a range of loss, or state that such an estimate cannot be made.  *Id*.

104.    The SEC considers the disclosure of loss contingencies to be of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. §210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, *except that* "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

105.    In addition, GAAP requires that financial statements disclose significant risks and uncertainties associated with an entity's business.   American Institute of Certified Public Accountant's Statement of Position No. 94-6.

106.    As Defendants knew or recklessly ignored, Pall, in violation of GAAP and SEC reporting rules and regulations, failed to disclose its contingent liabilities and significant risks and uncertainties associated with its intercompany sales and cash management practices, which were designed to evade U.S. income tax laws during the Class Period.

107.    Concerning the specific risks associated with the failure to clear intercompany balances arising from sales between Pall's domestic Medsep and foreign subsidiary Pall Netherlands, the website of Alvarez & Marsal, practitioners in the field of global cash management plans and foreign earnings repatriation strategies, notes that:

> *Intercompany accounts need to be specifically analyzed and properly accounted for such that by the end of each quarter the amounts are specifically traced and all intercompany amounts are actually cleared and netted on the books of the CFC.* This requires a system of tracing and offsets such that the books of the CFC are actually cleared, and the net cash should be paid each quarter.  *Without such a tracing system, the risk of a Code Section 956 [deemed dividend] inclusion increases.*  [Emphasis added.]

108.    Section 956 of the Internal Revenue Code (the "Code") was enacted by Congress in the Revenue Act of 1962 as part of its legislation on controlled foreign corporations ("CFCs")[5] and Subpart F income.[6] Prior to Code Section 956's enactment, U.S. shareholders of CFCs were able to defer tax on most of their offshore earnings until the CFC actually distributed a dividend to them. Congress enacted the rules on Subpart F income in order to end the deferral of tax on certain types of income by creating a tax on the deemed distribution of certain types of income.

109.    Code Section 956 defines the income that resulted in the taxation of Pall Netherlands' undistributed earnings to its parent shareholder Pall.  This category of income is defined as "an increase in earnings invested in U.S. property."  The Code further defines an "investment in U.S. property" broadly to include any "obligation of a U.S. person" to the CFC such as a loan or a trade receivable.

110.    Pall has admitted that it engaged in intercompany transactions related to the offshore manufacturing and insourcing of certain blood products to its domestic subsidiary Medsep from its related manufacturing CFC, Pall Netherlands.  To account for these transactions, Pall maintained intercompany accounts tracked as accounts receivable on the books of Pall Netherlands and trades payable on the books of the Medsep.  As alleged herein, Pall's senior management directed that no payments to settle intercompany balances arising from Medsep's purchase of products from Pall

---

[5]     The term CFC is define in Code Section 957.  Generally, a CFC is a legal construction used by U.S. and certain foreign tax authorities when referring to a legal entity that exists in one jurisdiction but is owned or controlled primarily by taxpayers of a different jurisdiction. CFC laws, such as Code Section 956, were introduced to stop tax evasion through the use of offshore companies in "tax havens" low-tax or no-tax jurisdictions such as the Netherlands.

[6]     Subpart F of the Code requires U.S corporations to include in income, among other things, certain "deemed" distributions from its foreign subsidiaries.  Section 956 of the Code defines specifics events and transactions that give rise to "deemed distributions" and how they should be measured for inclusion as Subpart F income.

Netherlands.  This practice gave rise to "deemed dividends" that Pall should have reported as taxable income on its U.S. tax returns, but did not.  In violation of GAAP, Pall failed to disclose the potential contingent liabilities and significant risks and uncertainties associated with such transfer pricing practices.  Now, Pall has admitted that its provisions for income taxes, its provisions for "inter-company expense allocations and certain other tax matters" and its payments of U.S. income taxes, penalties and interest were collectively understated by at least *$278 million* through April 30, 2007.

111.    In so doing, Pall's Class Period financial statements violated GAAP's income tax financial accounting and reporting standards as set forth in SFAS No. 109.[7]

**Pall's Financial Statements
Were Materially False and Misleading**

112.    Pall has admitted its omissions in accounting for income taxes overstated Pall's net income through April 30, 2007 by $278 million.  These omissions related directly to Pall's failure to report deemed distributions of earnings from its subsidiary, Pall Netherlands.

113.    While misstatements of Pall's financial statements during the Class Period were quantitatively material, the SEC's Staff Accounting Bulletin ("SAB") No. 99 points out that "qualitative factors may cause misstatements of quantitatively small amounts to be material" and that "the staff believes that a registrant and the auditors of its financial statements should not assume that *even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial*."  [Emphasis added.]

---

[7]    SFAS No. 109 provides that the objectives of accounting for income taxes are to recognize: (a) the amount of taxes payable or refundable for the current year; and (b) deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an enterprise's financial statements or tax returns.

114.     Defendants knew or recklessly ignored that Pall's income tax expense during the Class Period was materially understated.  Pall's income tax strategies were an integral element of the Company's business plan and were evaluated by management on an on-going basis.  In fact, Pall's 2006 10-K[8] disclosed:

> Significant judgment is required in determining the worldwide income tax expense provision.  In the ordinary course of a global business, there are many transactions and calculations where the ultimate tax outcome is uncertain.  Some of these uncertainties arise as a consequence of revenue sharing and cost reimbursement arrangements among related entities, the process of identifying items of revenue and expense that qualify for preferential tax treatment and segregation of foreign and domestic income and expense to avoid double taxation.  No assurance can be given that the final tax outcome of these matters will not be different than that which is reflected in the Company's historical income tax provisions and accruals.  Such differences could have a material effect on the Company's income tax provision and net earnings in the period in which such a determination is made.

> The Company records a valuation allowance to reduce deferred tax assets to the amount of future tax benefit that is more likely than not to be realized.  While Company management has considered future taxable income and ongoing prudent and feasible tax planning strategies in assessing the need for the valuation allowance, there is no assurance that the valuation allowance would not need to be increased to cover additional deferred tax assets that may not be realizable.  Any increase in the valuation allowance could have a material adverse impact on the Company's income tax provision and net earnings in the period in which such determination is made.

115.     Accordingly, Pall has admitted that it evaluated the Company's future taxable income in each of the taxing jurisdictions in which it operated, as well as the feasibility of tax planning strategies on an on-going basis during the Class Period.

116.     These disclosures indicate that Pall's income tax strategies were a centerpiece of the Company's business plan and were evaluated by management during the Class Period on an on-

---

[8]     Substantially similar representations were made in the Company's 2002, 2003, 2004 and 2005 Form 10-K.

going basis.  Accordingly, Pall's transfer pricing arrangements were known to, and/or condoned by, the highest level of Pall's management and the Individual Defendants during the Class Period.

**Pall's Other Violations of GAAP and
False and Misleading Financial Reporting**

117.     In addition to the violations of GAAP noted above, Pall presented its financial statements in a manner that also violated at least the following provisions of GAAP:

(a)     The principal that financial statements identify material related party transactions and disclose: (a) the nature of the relationship(s); (b) a description of the transaction; (c) the dollar amount of transactions for each period for which an income statement is presented; and (d) the amounts due from or to the related parties as of the date of each balance sheet (SFAS No. ¶57);

(b)     The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶34);

(c)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

(d)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

(e)     The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information

about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (Concepts  Statement No. 1, ¶42);

        (f)     The concept that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

        (g)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

        (h)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

        118.     The Company's Class Period Forms 10-K and Forms 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

**Pall's False and Misleading Internal Financial
and Disclosure Controls and Management Certifications**

        119.     The Company's 2007 10-K revealed that:

DISCLOSURE CONTROLS AND PROCEDURES

The Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's chief

executive officer and chief financial officer, of the effectiveness of the Company's disclosure controls and procedures as of July 31, 2007.  Based on this evaluation and considering the material weakness in internal control over financial reporting described below relating to the Company's accounting for income taxes, the chief executive officer and chief financial officer concluded that ***the Company's disclosure controls and procedures were not effective as of such date to ensure that information required to be disclosed in the reports that it files or submits under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms.***

The Company has taken remedial action with respect to such material weakness and is continuing to consider the appropriateness of other measures as more fully described below.  In addition, in January 2008, the Company terminated the employment of four employees who previously had been placed on administrative leave as a result of the matter that gave rise to the restatement and who had principal responsibility for tax and treasury matters.

INTERNAL CONTROL OVER FINANCIAL REPORTING

Management conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.  ***Based on this evaluation, management concluded that the Company's internal control over financial reporting was not effective as of July 31, 2007.***

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.  The following material weakness was identified as of July 31, 2007: ***the Company lacked a periodic review to ensure that the income tax impact of certain intercompany transactions were properly considered in the Company's provision for income taxes.  The Company has restated its previously issued consolidated financial statements for each of the eight fiscal years in the period ended July 31, 2006 and for each of the fiscal quarters ended October 31, 2006, January 31, 2007, and April 30, 2007 to correct reported provision for income taxes, interest expense, net, income taxes payable, and deferred income taxes in such consolidated financial statements.***  [Emphasis added.]

120.    The above admissions rendered the following disclosures in Pall's 2006 10-K

materially false and misleading:

As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the articipation of the Company's

management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures pursuant to Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934. Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective.

121.    These materially false and misleading disclosures were repeated in all material respects in Pall's 2006 10-K, 2005 10-K and 2004 10-K and each of Pall's Forms 10-Q filed for those same fiscal periods

122.    The above noted false and misleading internal and disclosure control representations were then falsely certified, in all material respects, by Defendants Krasnoff and McDermott and included in Pall's above noted Forms 10-K and 10-Q:

I, …… , certify that:

1.    I have reviewed this report on Form …. of Pall Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to

- 56 -

provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: June 8, 2007

## Additional Scienter Allegations

123.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Pall, their control over, and/or receipt and/or modification of Pall's allegedly materially misleading misstatements and/or their associations with

the Company which made them privy to confidential proprietary information concerning Pall, participated in the fraudulent scheme alleged herein.

124.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

125.     The fact that the Company has now restated its financial results for fiscal years 1999 to 2006 and the first three quarters of fiscal 2007, and has admitted that it reported falsified financial statements throughout the Class Period, constitutes strong circumstantial evidence of Defendants' scienter.  Not only does the restatement confirm that the Company's reported financial results throughout the Class Period were false, but based on the magnitude, duration and pervasiveness of the fraudulent accounting practices, all of which violated GAAP, the Company's restatement constitutes strong circumstantial evidence that each of the Individual Defendants knew, or at a minimum deliberately disregarded, the overwhelming prevalence of improper accounting practices and falsification of the Company's financial results throughout the Class Period.

126.     The Individual Defendants were motivated to engage in such a scheme to inflate the price of Pall stock in order to enable Pall insiders to engage in profitable sales of their personally held Pall stock.  The Individual Defendants took full advantage of the artificial inflation in the Company's stock price caused by their material misrepresentations.  For scienter purposes, all of Defendants' Pall stock sales during the period for which Defendants have admitted the Company's financial results were misstated from 1999 through the end of the Class Period (the "Fraud Period") are relevant.  While Defendants were engaged in their tax fraud during the Fraud Period, the

Individual Defendants sold a total of 364,501 shares of stock for $10,177,014 in proceeds, as listed below:

| NAME | DATE | SHARES | PRICE | PROCEEDS |
|------|------|--------|-------|----------|
| ERIC KRASNOFF | 6/6/2003 | 13,000 | $23.81 | $309,530 |
| | 6/6/2003 | 4,000 | $23.80 | 95,200 |
| | 6/6/2003 | 3,500 | $23.86 | 83,510 |
| | 7/7/2003 | 54,350 | $22.85 | 1,241,898 |
| | 4/13/2004 | 80,000 | $24.07 | 1,925,600 |
| | 4/13/2004 | 39,800 | $23.90 | 951,220 |
| | 4/13/2004 | 200 | $23.99 | 4,798 |
| | 12/15/2004 | 23,000 | $29.05 | 668,150 |
| | 12/15/2004 | 8,400 | $29.08 | 244,272 |
| | 12/15/2004 | 7,900 | $29.15 | 230,285 |
| | 12/15/2004 | 500 | $29.07 | 14,535 |
| | 12/15/2004 | 100 | $29.17 | 2,917 |
| | 12/15/2004 | 100 | $29.09 | 2,909 |
| | 12/14/2006 | 15,500 | $34.95 | 541,725 |
| | 12/14/2006 | 13,900 | $34.87 | 484,693 |
| | 12/14/2006 | 11,300 | $34.94 | 394,822 |
| | 12/14/2006 | 9,900 | $34.92 | 345,708 |
| | 12/14/2006 | 9,400 | $34.88 | 327,872 |
| | 12/14/2006 | 8,200 | $34.90 | 286,180 |
| | 12/14/2006 | 5,600 | $35.00 | 196,000 |
| | 12/14/2006 | 5,100 | $34.96 | 178,296 |
| | 12/14/2006 | 4,500 | $34.93 | 157,185 |
| | 12/14/2006 | 3,700 | $35.04 | 129,648 |
| | 12/14/2006 | 3,200 | $35.06 | 112,192 |
| | 12/14/2006 | 2,900 | $34.75 | 100,775 |
| | 12/14/2006 | 2,701 | $35.05 | 94,670 |
| | 12/14/2006 | 2,700 | $35.03 | 94,581 |
| | 12/14/2006 | 2,500 | $34.89 | 87,225 |
| | 12/14/2006 | 2,200 | $34.91 | 76,802 |
| | 12/14/2006 | 2,000 | $35.01 | 70,020 |
| | 12/14/2006 | 2,000 | $35.07 | 70,140 |
| | 12/14/2006 | 800 | $34.98 | 27,984 |
| | 12/14/2006 | 400 | $34.99 | 13,996 |
| | 12/14/2006 | 200 | $34.97 | 6,994 |
| | 12/14/2006 | 100 | $35.08 | 3,508 |
| | 12/15/2006 | 1,800 | $34.81 | 62,658 |
| | 12/15/2006 | 1,500 | $34.80 | 52,200 |
| | 12/15/2006 | 1,000 | $34.78 | 34,780 |
| | 12/15/2006 | 900 | $34.79 | 31,311 |
| | 12/15/2006 | 500 | $34.77 | 17,385 |
| | 12/15/2006 | 300 | $34.82 | 10,446 |
| | | 349,651 | | $9,784,620 |

| LISA MCDERMOTT | 12/10/2001 | 2,500 | $24.54 | $61,350 |
|---|---|---|---|---|
| | 12/8/2003 | 2,500 | $25.61 | 64,025 |
| | 12/12/2003 | 4,925 | $26.29 | 129,478 |
| | 10/5/2004 | 1,325 | $24.93 | 33,032 |
| | 10/5/2004 | 600 | $24.85 | 14,910 |
| | 12/6/2004 | 1,500 | $29.01 | 43,515 |
| | 6/24/2005 | 1,200 | $30.72 | 36,864 |
| | 6/24/2005 | 200 | $30.73 | 6,146 |
| | 6/24/2005 | 100 | $30.74 | 3,074 |
| | | 14,850 | | $392,395 |
| GRAND TOTAL | | 364,501 | | $10,177,014 |

127.   The Individual Defendants sales were highly unusual and suspicious.  Defendant
Krasnoff sold 80% of his shares held during the Fraud Period.  Defendant McDermott sold 100% of
her shares held during the Fraud Period

128.   In addition to the Individual Defendants, other Pall insiders sold 1,446726 shares of
their personally held Pall common stock, generating proceeds of $37,647,551 during the Fraud
Period, including Adamovich, Pall's former CFO President, Jeremy Hayward-Surry, Pall's former
President, and Wilson, Pall's former President, and Raj Patel, Pall's former Chief Accountant, as
listed below:

| INSIDER SALES DURING THE FRAUD PERIOD | | | | |
|---|---|---|---|---|
| NAME | DATE | SHARES | PRICE | PROCEEDS |
| JOHN ADAMOVICH | 11/30/01 | 50,987 | $23.00 | $1,172,701 |
| | 12/14/01 | 1,000 | $24.15 | 24,150 |
| | 01/07/02 | 10,290 | $24.07 | 247,680 |
| | 06/06/03 | 19,722 | $24.00 | 473,328 |
| | 12/08/03 | 9,700 | $25.50 | 247,350 |
| | 12/17/03 | 4,000 | $26.40 | 105,600 |
| | 12/17/03 | 1,000 | $26.46 | 26,460 |
| | 06/29/04 | 33,750 | $25.43 | 858,263 |
| | 10/05/04 | 10,600 | $24.90 | 263,940 |
| | 10/05/04 | 900 | $24.86 | 22,374 |
| | 10/05/04 | 800 | $24.87 | 19,896 |

|  |  |  |  |  |
|---|---|---|---|---|
|  | 10/05/04 | 75 | $24.88 | 1,866 |
|  |  | 142,824 |  | $3,463,608 |
| JEREMY HAYWARD-SURRY | 01/07/99 | 24,100 | $25.00 | $602,500 |
|  | 01/07/99 | 22,743 | $25.42 | 578,127 |
|  | 01/07/99 | 157 | $25.13 | 3,945 |
|  | 10/10/03 | 16,100 | $23.53 | 378,833 |
|  | 10/10/03 | 4,800 | $23.56 | 113,088 |
|  | 10/10/03 | 2,700 | $23.50 | 63,450 |
|  | 10/10/03 | 1,900 | $23.57 | 44,783 |
|  | 10/10/03 | 1,700 | $23.48 | 39,916 |
|  | 10/10/03 | 1,000 | $23.46 | 23,460 |
|  | 10/10/03 | 1,000 | $23.49 | 23,490 |
|  | 10/10/03 | 500 | $23.55 | 11,775 |
|  | 10/10/03 | 300 | $23.47 | 7,041 |
|  |  | 77,000 |  | $1,890,408 |
| VIRAJ PATEL | 11/22/99 | 3,500 | $23.00 | $80,500 |
|  |  | 3,500 |  | $80,500 |
| MARCUS WILSON | 07/10/03 | 20,000 | $22.28 | $445,600 |
|  | 12/08/03 | 32,000 | $25.65 | 820,800 |
|  | 01/13/05 | 7,000 | $27.20 | 190,400 |
|  | 06/23/05 | 4,200 | $31.27 | 131,334 |
|  | 06/23/05 | 800 | $31.30 | 25,040 |
|  | 01/11/06 | 2,100 | $28.26 | 59,346 |
|  | 01/11/06 | 984 | $28.27 | 27,818 |
|  |  | 67,084 |  | $1,700,338 |
| ABRAHAM APPEL | 10/06/04 | 5,600 | $24.87 | $139,272 |
|  | 10/06/04 | 1,100 | $24.89 | 27,379 |
|  | 10/06/04 | 1,000 | $24.88 | 24,880 |
|  | 10/06/04 | 800 | $24.94 | 19,952 |
|  | 10/06/04 | 600 | $24.90 | 14,940 |
|  | 10/06/04 | 500 | $24.93 | 12,465 |
|  | 10/06/04 | 300 | $24.95 | 7,485 |
|  | 10/06/04 | 100 | $24.92 | 2,492 |
|  |  | 10,000 |  | $248,865 |
| MARY BARTLETT | 04/02/07 | 1,262 | $37.87 | $47,792 |
|  | 04/02/07 | 400 | $37.84 | 15,136 |
|  | 04/02/07 | 300 | $37.85 | 11,355 |
|  | 04/02/07 | 200 | $37.86 | 7,572 |
|  | 04/02/07 | 88 | $37.88 | 3,333 |

|  |  |  | 2,250 |  | $85,188 |
|---|---|---|---|---|---|
| DANIEL CARROLL | 10/07/04 | 9,400 | $24.96 | $234,624 |
|  | 10/07/04 | 2,400 | $24.97 | 59,928 |
|  | 10/07/04 | 533 | $24.98 | 13,314 |
|  | 06/14/05 | 9,300 | $29.09 | 270,537 |
|  | 06/14/05 | 500 | $29.16 | 14,580 |
|  | 06/14/05 | 100 | $29.17 | 2,917 |
|  | 06/14/05 | 100 | $29.18 | 2,918 |
|  |  | 22,333 |  | $598,818 |
| STEVEN CHISOLM | 06/29/01 | 15,000 | $23.74 | $356,100 |
|  | 06/29/01 | 7,500 | $23.74 | 178,050 |
|  | 06/17/03 | 10,000 | $24.11 | 241,100 |
|  | 06/17/03 | 5,000 | $24.08 | 120,400 |
|  | 12/24/03 | 20,000 | $26.65 | 533,000 |
|  | 12/06/04 | 7,000 | $29.35 | 205,450 |
|  | 12/06/04 | 350 | $29.39 | 10,287 |
|  | 12/07/04 | 11,700 | $29.35 | 343,395 |
|  | 12/07/04 | 200 | $29.38 | 5,876 |
|  | 06/20/05 | 9,052 | $30.15 | 272,918 |
|  | 01/09/06 | 7,325 | $27.50 | 201,438 |
|  | 01/09/06 | 1,300 | $27.53 | 35,789 |
|  | 01/09/06 | 1,000 | $27.51 | 27,510 |
|  | 03/15/06 | 9,300 | $28.63 | 266,259 |
|  | 03/15/06 | 700 | $28.64 | 20,048 |
|  | 09/26/06 | 5,948 | $30.90 | 183,793 |
|  |  | 111,375 |  | $3,001,412 |
| ANDREW DENVER | 01/07/05 | 15,900 | $27.82 | $442,338 |
|  | 01/07/05 | 8,000 | $27.88 | 223,040 |
|  | 01/07/05 | 7,750 | $28.00 | 217,000 |
|  | 01/07/05 | 100 | $27.94 | 2,794 |
|  |  | 31,750 |  | $885,172 |
| PETER COPE | 06/22/99 | 15,000 | $20.88 | $313,200 |
|  |  | 15,000 |  | $313,200 |
| STEVEN GRECO | 01/10/07 | 1,000 | $33.98 | $33,980 |
|  |  | 1,000 |  | $33,980 |
| CHARLES GRIMM | 04/04/00 | 2,000 | $23.00 | $46,000 |
|  | 04/05/00 | 2,000 | $23.00 | 46,000 |

|  | | | |
|---|---|---|---|
|  | 12/26/00 | 2,500 | $20.00 | 50,000 |
|  | 06/03/01 | 2,500 | $23.75 | 59,375 |
|  | 06/04/01 | 2,500 | $23.00 | 57,500 |
|  | 01/03/02 | 3,000 | $24.06 | 72,180 |
|  | 06/06/03 | 10,000 | $24.00 | 240,000 |
|  | 06/06/03 | 500 | $24.00 | 12,000 |
|  | 06/06/03 | 500 | $24.08 | 12,040 |
|  | 06/11/03 | 1,000 | $24.06 | 24,060 |
|  | 06/12/03 | 500 | $24.15 | 12,075 |
|  | 06/13/03 | 500 | $24.07 | 12,035 |
|  | 06/17/03 | 500 | $24.20 | 12,100 |
|  | 06/18/03 | 400 | $24.30 | 9,720 |
|  | 06/18/03 | 100 | $24.34 | 2,434 |
|  | 07/11/03 | 10,000 | $22.89 | 228,900 |
|  | 12/12/03 | 20,000 | $26.00 | 520,000 |
|  | 01/08/04 | 15,000 | $26.95 | 404,250 |
|  | 06/30/04 | 600 | $25.61 | 15,366 |
|  | 06/30/04 | 400 | $25.62 | 10,248 |
|  |  | 74,500 | | $1,846,283 |
| ULRIC HAYNES | 10/04/04 | 4,200 | $25.00 | $105,000 |
|  | 10/07/04 | 5,800 | $25.00 | 145,000 |
|  |  | 10,000 | | $250,000 |
| HEINZ HENSGEN | 01/12/04 | 6,300 | $26.50 | $166,950 |
|  | 01/12/04 | 700 | $26.55 | 18,585 |
|  | 03/12/04 | 1,100 | $23.20 | 25,520 |
|  | 03/12/04 | 400 | $23.21 | 9,284 |
|  | 10/08/04 | 2,900 | $25.01 | 72,529 |
|  | 10/08/04 | 11,100 | $25.00 | 277,500 |
|  | 01/11/05 | 7,200 | $27.45 | 197,640 |
|  | 01/11/05 | 6,500 | $27.46 | 178,490 |
|  | 01/11/05 | 300 | $27.51 | 8,253 |
|  |  | 36,500 | | $954,751 |
| CLIFTON HUTCHINGS | 09/24/99 | 3,400 | $22.75 | $77,350 |
|  | 01/04/01 | 2,600 | $22.56 | 58,656 |
|  | 07/05/01 | 16,200 | $23.40 | 379,080 |
|  |  | 22,200 | | $515,086 |
| RICHI INOUE | 06/18/03 | 6,000 | $24.50 | $147,000 |
|  | 12/09/03 | 12,500 | $26.00 | 325,000 |
|  | 12/09/03 | 5,000 | $26.00 | 130,000 |
|  | 12/09/03 | 4,425 | $26.00 | 115,050 |
|  | 12/12/03 | 5,200 | $26.00 | 135,200 |

- 63 -

| | | | | |
|---|---|---|---|---|
| | 10/07/04 | 18,375 | $25.00 | 459,375 |
| | | 51,500 | | $1,311,625 |
| | 01/04/99 | 7,500 | $25.63 | $192,225 |
| | 01/04/99 | 5,568 | $25.50 | 141,984 |
| | 01/04/99 | 1,932 | $25.56 | 49,382 |
| | 06/18/01 | 8,750 | $23.44 | 205,100 |
| | | 23,750 | | $588,691 |
| ABRHAM KRASNOFF | 06/23/99 | 50,000 | $20.94 | $1,047,000 |
| | | 50,000 | | $1,047,000 |
| NEIL MACDONALD | 12/11/01 | 8,650 | $24.06 | $208,119 |
| | 06/09/03 | 3,175 | $23.95 | 76,041 |
| | 12/08/03 | 18,750 | $25.50 | 478,125 |
| | 10/12/04 | 5,600 | $24.92 | 139,552 |
| | 10/12/04 | 650 | $24.99 | 16,244 |
| | 12/06/04 | 25,900 | $28.80 | 745,920 |
| | 12/06/04 | 350 | $28.91 | 10,119 |
| | 12/16/04 | 15,800 | $28.65 | 452,670 |
| | 12/16/04 | 2,650 | $28.75 | 76,188 |
| | 12/16/04 | 800 | $28.68 | 22,944 |
| | 06/08/05 | 8,750 | $28.70 | 251,125 |
| | 06/23/05 | 2,337 | $31.28 | 73,101 |
| | 10/03/05 | 7,725 | $27.25 | 210,506 |
| | 10/03/05 | 1,700 | $27.35 | 46,495 |
| | 10/03/05 | 200 | $27.26 | $5,452 |
| | | 103,037 | | $2,812,600 |
| EDWIN MARTIN | 06/04/04 | 2,000 | $23.95 | $47,900 |
| | 06/09/04 | 2,000 | $24.44 | 48,880 |
| | 06/28/04 | 4,000 | $25.00 | 100,000 |
| | 10/07/04 | 4,000 | $25.00 | 100,000 |
| | 07/13/05 | 5,000 | $29.56 | 147,800 |
| | 04/04/06 | 675 | $30.86 | 20,831 |
| | 07/09/07 | 4,625 | $47.28 | 218,670 |
| | | 22,300 | | $684,081 |
| JOHN MILLER | 01/05/01 | 3,000 | $22.44 | $67,320 |
| | 01/05/01 | 1,000 | $22.19 | 22,190 |
| | 01/05/01 | 1,000 | $22.25 | 22,250 |
| | 04/09/01 | 4,000 | $22.00 | 88,000 |
| | 04/10/01 | 2,800 | $23.00 | 64,400 |
| | 07/05/01 | 12,500 | $23.70 | 296,250 |

|  | | | | |
|---|---|---|---|---|
|  | 01/04/02 | 6,000 | $24.23 | 145,380 |
|  | 06/19/03 | 6,745 | $24.50 | 165,253 |
|  | 12/09/03 | 3,792 | $26.00 | 98,592 |
|  | 01/08/04 | 7,500 | $26.85 | 201,375 |
|  | 01/08/04 | 5,138 | $27.00 | 138,726 |
|  | 07/14/04 | 5,000 | $24.35 | 121,750 |
|  | 10/01/04 | 1,000 | $24.66 | 24,660 |
|  | 10/01/04 | 170 | $24.68 | 4,196 |
|  | 10/07/04 | 1,000 | $25.00 | 25,000 |
|  | 10/13/04 | 800 | $25.27 | 20,216 |
|  | 10/13/04 | 100 | $25.30 | 2,530 |
|  | 10/13/04 | 100 | $25.29 | 2,529 |
|  | 12/06/04 | 24,100 | $28.90 | 696,490 |
|  | 12/06/04 | 6,096 | $28.94 | 176,418 |
|  | 12/06/04 | 3,800 | $28.96 | 110,048 |
|  | 12/06/04 | 3,048 | $28.94 | 88,209 |
|  | 12/06/04 | 1,900 | $28.96 | 55,024 |
|  | 12/06/04 | 382 | $28.97 | 11,067 |
|  | 12/06/04 | 195 | $28.97 | 5,649 |
|  | 12/06/04 | 195 | $28.97 | 5,649 |
|  | 12/06/04 | 191 | $28.97 | 5,533 |
|  | 12/22/04 | 14,100 | $29.00 | 408,900 |
|  | 12/22/04 | 2,800 | $28.81 | 80,668 |
|  | 12/22/04 | 200 | $28.85 | 5,770 |
|  | 12/22/04 | 150 | $29.10 | 4,365 |
|  | 06/23/05 | 2,900 | $31.00 | 89,900 |
|  | 06/23/05 | 148 | $31.20 | 4,618 |
|  |  | __121,850__ |  | __$3,258,924__ |
| ROBERTO PEREZ | 12/06/04 | 3,400 | $28.83 | $98,022 |
|  | 12/06/04 | 250 | $28.84 | 7,210 |
|  | 12/06/04 | 100 | $28.82 | 2,882 |
|  | 04/07/05 | 3,707 | $26.93 | 99,830 |
|  | 06/20/05 | 7,700 | $30.15 | 232,155 |
|  | 06/20/05 | 6,100 | $30.17 | 184,037 |
|  | 06/20/05 | 5,800 | $30.16 | 174,928 |
|  | 06/20/05 | 1,400 | $30.20 | 42,280 |
|  | 01/12/06 | 9,375 | $28.46 | 266,813 |
|  | 03/23/06 | 1,330 | $30.31 | 40,302 |
|  | 04/02/07 | 4,125 | $38.16 | 157,410 |
|  | 04/02/07 | 1,725 | $38.02 | 65,585 |
|  | 04/02/07 | 1,200 | $38.24 | 45,888 |
|  | 04/02/07 | 1,050 | $38.22 | 40,131 |
|  | 04/02/07 | 1,000 | $38.17 | 38,170 |
|  | 04/02/07 | 973 | $38.00 | 36,974 |
|  | 04/02/07 | 900 | $38.01 | 34,209 |
|  | 04/02/07 | 900 | $38.27 | 34,443 |
|  | 04/02/07 | 800 | $38.15 | 30,520 |
|  | 04/02/07 | 700 | $38.05 | 26,635 |

- 65 -

|  | 04/02/07 | 700 | $38.06 | 26,642 |
|---|---|---|---|---|
|  | 04/02/07 | 700 | $38.25 | 26,775 |
|  | 04/02/07 | 650 | $38.03 | 24,720 |
|  | 04/02/07 | 600 | $38.08 | 22,848 |
|  | 04/02/07 | 500 | $38.04 | 19,020 |
|  | 04/02/07 | 500 | $38.18 | 19,090 |
|  | 04/02/07 | 400 | $38.21 | 15,284 |
|  | 04/02/07 | 300 | $38.09 | 11,427 |
|  | 04/02/07 | 300 | $38.26 | 11,478 |
|  | 04/02/07 | 200 | $38.07 | 7,614 |
|  | 04/02/07 | 100 | $38.11 | 3,811 |
|  | 04/02/07 | 100 | $38.14 | 3,814 |
|  | 04/02/07 | 100 | $38.30 | 3,830 |
|  | 04/03/07 | 4,477 | $38.03 | 170,260 |
|  |  | 62,162 |  | 2,025,035 |
| REED SARVER | 12/11/01 | 2,000 | $24.34 | $48,680 |
|  | 06/16/03 | 7,000 | $24.01 | 168,070 |
|  | 06/16/03 | 4,000 | $24.01 | 96,040 |
|  | 12/19/03 | 7,500 | $26.41 | 198,075 |
|  | 12/19/03 | 5,000 | $26.41 | 132,050 |
|  | 12/23/03 | 5,000 | $26.48 | 132,400 |
|  | 12/10/04 | 5,800 | $29.15 | 169,070 |
|  | 12/10/04 | 200 | $29.22 | 5,844 |
|  | 06/13/05 | 3,900 | $28.80 | 112,320 |
|  | 06/13/05 | 2,100 | $28.87 | 60,627 |
|  | 06/23/05 | 6,600 | $31.05 | 204,930 |
|  | 06/23/05 | 400 | $31.22 | 12,488 |
|  |  |  |  | - |
|  |  | 49,500 |  | $1,340,594 |
| AKIO SATAKE | 12/07/98 | 30,000 | $24.00 | $720,000 |
|  | 06/08/99 | 1,300 | $20.56 | $26,728 |
|  |  | 31,300 |  | $746,728 |
| GREGORY SCHEESSELE | 04/02/03 | 1,750 | $21.00 | $36,750 |
|  | 06/10/03 | 1,750 | $24.00 | 42,000 |
|  | 12/22/03 | 9,625 | $26.40 | 254,100 |
|  | 12/22/03 | 1,500 | $26.40 | 39,600 |
|  | 06/30/04 | 12,500 | $26.00 | 325,000 |
|  | 06/30/04 | 750 | $26.00 | 19,500 |
|  | 12/07/04 | 9,625 | $29.50 | 283,938 |
|  | 06/06/05 | 16,250 | $28.75 | 467,188 |
|  |  | 53,750 |  | $1,468,075 |
| HEYWOOD SHELLEY | 03/20/00 | 1,000 | $23.00 | $23,000 |

- 66 -

| | | | | |
|---|---|---|---|---|
| | 03/08/01 | 1,000 | $24.13 | 24,130 |
| | 06/13/03 | 6,000 | $23.70 | 142,200 |
| | 06/13/03 | 3,800 | $23.80 | 90,440 |
| | 06/13/03 | 200 | $23.79 | 4,758 |
| | | 12,000 | | $284,528 |
| ROBERT SIMKINS | 06/26/98 | 7,499 | $21.13 | $158,454 |
| | 12/16/98 | 5,566 | $24.00 | 133,584 |
| | 12/16/98 | 2,484 | $24.06 | 59,765 |
| | | 15,549 | | $351,803 |
| DONALD STEVENS | 09/10/99 | 5,586 | $25.00 | $139,650 |
| | 09/24/99 | 5,664 | $22.75 | 128,856 |
| | 04/12/00 | 3,500 | $24.00 | 84,000 |
| | 06/06/03 | 2,795 | $23.90 | 66,795 |
| | 06/11/03 | 9,697 | $24.00 | 232,728 |
| | 06/12/03 | 10,000 | $23.95 | 239,500 |
| | 12/11/03 | 15,900 | $25.98 | 413,082 |
| | 12/12/03 | 19,100 | $25.98 | 496,218 |
| | 10/08/04 | 13,750 | $25.00 | 343,750 |
| | 06/23/05 | 13,300 | $31.15 | 414,295 |
| | 06/23/05 | 4,044 | $31.21 | 126,213 |
| | 06/23/05 | 1,700 | $31.23 | 53,091 |
| | 06/23/05 | 1,303 | $31.22 | 40,680 |
| | 12/12/06 | 5,400 | $34.84 | 188,136 |
| | 12/12/06 | 4,931 | $34.88 | 171,993 |
| | 12/12/06 | 3,698 | $34.92 | 129,134 |
| | 12/12/06 | 2,900 | $34.87 | 101,123 |
| | 12/12/06 | 2,500 | $34.85 | 87,125 |
| | 12/12/06 | 2,500 | $34.86 | 87,150 |
| | 12/12/06 | 2,500 | $34.82 | 87,050 |
| | 12/12/06 | 2,500 | $34.81 | 87,025 |
| | 12/12/06 | 1,869 | $34.89 | 65,209 |
| | 12/12/06 | 1,200 | $34.79 | 41,748 |
| | 12/12/06 | 800 | $34.91 | 27,928 |
| | 12/12/06 | 800 | $34.80 | 27,840 |
| | 12/12/06 | 500 | $34.78 | 17,390 |
| | 12/12/06 | 100 | $34.90 | $3,490 |
| | | 138,537 | | $3,901,199 |
| JAMES WATSON | 09/23/05 | 9,300 | $26.95 | $250,635 |
| | 09/23/05 | 600 | $26.96 | 16,176 |
| | 09/23/05 | 100 | $26.99 | 2,699 |
| | 10/07/05 | 175 | $26.48 | 4,634 |
| | | 10,175 | | $274,144 |

| | | | | |
|---|---|---|---|---|
| GERHARD WEICH | 12/15/98 | 35,000 | $23.41 | $819,350 |
| | 04/11/00 | 5,000 | $23.50 | 117,500 |
| | | 40,000 | | $936,850 |
| JAMES WESTERN | 12/06/04 | 800 | $29.00 | $23,200 |
| | 12/06/04 | 200 | $29.08 | 5,816 |
| | 12/28/04 | 1,600 | $28.89 | 46,224 |
| | 12/28/04 | 400 | $28.94 | 11,576 |
| | 04/01/05 | 1,100 | $27.19 | 29,909 |
| | 04/01/05 | 200 | $27.21 | 5,442 |
| | 04/01/05 | 200 | $27.22 | 5,444 |
| | 06/06/05 | 1,000 | $28.71 | 28,710 |
| | 03/06/06 | 1,500 | $28.28 | 42,420 |
| | | 7,000 | | $198,741 |
| SAMUEL WORTHAM | 06/18/99 | 5,000 | $22.00 | $110,000 |
| | 06/21/99 | 1,000 | $21.00 | 21,000 |
| | 06/25/99 | 5,000 | $21.13 | 105,650 |
| | 07/05/02 | 8,000 | $20.09 | 160,720 |
| | 07/12/02 | 3,900 | $18.78 | 73,242 |
| | 07/12/02 | 2,000 | $19.15 | 38,300 |
| | 07/12/02 | 2,000 | $19.25 | 38,500 |
| | 07/12/02 | 100 | $19.11 | 1,911 |
| | | 27,000 | | $549,323 |
| GRAND TOTAL | | 1,446,726 | | $37,647,551 |

129.    The Individual Defendants' fraudulent intent is further evidenced by their receipt of bonuses through the Company's bonus plan, which entitled the Individual Defendants and other officers to receive an incentive bonus based on the Company's reported cumulative returns on equity and consolidated net income over a multi-year period.

## LOSS CAUSATION/ECONOMIC LOSS

130.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Pall's common stock price and operated as a fraud or deceit on Class Period purchasers of Pall's common stock by failing to

disclose that its financial results were materially overstated because the Company was materially understating its income tax liability.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Pall's common stock price fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Pall's common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

131.    Defendants' false and misleading statements had the intended effect and caused Pall's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $48.87 per share on July 13, 2007.

132.    As a direct result of Defendants' disclosures on July 19, 2007 and August 2, 2007, Pall's common stock price fell precipitously.  These drops removed the inflation from the price of Pall's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

133.    The more than 18% decline in the price of Pall's common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Pall's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Pall's securities and the subsequent significant decline in the value of Pall's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

134.    At all relevant times, the market for Pall's common stock was an efficient market for the following reasons, among others:

(a)    Pall's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Pall filed periodic public reports with the SEC and the NYSE;

(c)    Pall regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Pall was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

135.    As a result of the foregoing, the market for Pall's common stock promptly digested current information regarding Pall from all publicly available sources and reflected such information in Pall's stock price. Under these circumstances, all purchasers of Pall's common stock during the Class Period suffered similar injury through their purchase of Pall's common stock at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

136.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Pall who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

137.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

140.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Pall common stock.  Plaintiff and the Class would not have purchased Pall common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

141.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Pall common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

142.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

143.    The Individual Defendants acted as controlling persons of Pall within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Pall, and their ownership of Pall stock, the Individual Defendants had the power and authority to cause Pall to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  August 4, 2008                        COUGHLIN STOIA GELLER
                                                 RUDMAN & ROBBINS LLP
                                              SAMUEL H. RUDMAN
                                              RUSSELL J. GUNYAN


                                              _____
                                                      SAMUEL H. RUDMAN

                                              58 South Service Road, Suite 200
                                              Melville, NY 11747
                                              Telephone:  631/367.7100
                                              631/367.1173 (fax)

                                              Lead Counsel for Plaintiffs

                                              VANOVERBEKE MICHAUD & TIMMONY, P.C.
                                              MICHAEL J. VANOVERBEKE
                                              THOMAS C. MICHAUD
                                              79 Alfred Street
                                              Detroit, MI  48201
                                              Telephone:  313/578-1200
                                              313/578-1201 (fax)

                                              Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2008, I caused the foregoing Consolidated Amended

Complaint to be electronically filed with the Clerk of the Court using the CM/ECF system, which

will send notification of such public filing to all counsel registered to receive such notice and I

hereby certify that I have mailed the foregoing document *via* the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

PALL CORP. (LEAD)
Service List - 7/31/2008    (07-0166)
Page 1 of  1

**Counsel For Defendant(s)**

Lewis J. Liman
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006
   212/225-2000
   212/225-3999 (Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)

Michael J. VanOverbeke
Thomas C. Michaud
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI  48201
   313/578-1200
   313/578-1201 (Fax)