UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————— x

In re PALL CORP. SECURITIES
LITIGATION

————————————————————————

This Document Relates To:

    ALL ACTIONS.

————————————————————————

:
:
:
:
:
:
:
:
:
:
x

Master File No. 2:07-cv-03359-JS-GRB

CLASS ACTION

DECLARATION OF SAMUEL H.
RUDMAN IN SUPPORT OF LEAD
PLAINTIFF'S MOTION FOR FINAL
APPROVAL OF SETTLEMENT AND PLAN
OF DISTRIBUTION OF SETTLEMENT
PROCEEDS, AND AN AWARD OF
ATTORNEYS' FEES AND EXPENSES

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   RELEVANT PROCEDURAL HISTORY AND FACTUAL SUMMARY OF
      PLAINTIFF'S CLAIMS ..........................................................................................6

III.  FACT DISCOVERY ...........................................................................................10

      A.   Discovery Overview ...............................................................................10

      B.   Lead Plaintiff's Discovery Requests to Defendants ...............................11

      C.   Lead Plaintiff's Discovery Requests to Third Parties.............................12

      D.   Defendants' Discovery Sought from Lead Plaintiff ...............................14

      E.   Lead Plaintiff's Motion to Compel Investigative Documents ...............15

      F.   Protective Order .....................................................................................16

IV.   INVESTIGATORS, CONSULTANTS, AND EXPERTS .........................................16

      A.   Investigators...........................................................................................16

      B.   Forensic Accounting Consultants ...........................................................17

      C.   Tax Expert ..............................................................................................18

      D.   Loss Causation and Damages Expert ......................................................18

V.    THE STRENGTHS AND WEAKNESSES OF THE CASE .....................................20

VI.   SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT.................22

VII.  NOTICE TO MEMBERS OF THE SETTLEMENT CLASS ...................................24

VIII. THE PLAN OF DISTRIBUTION ........................................................................24

IX.   LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND EXPENSES IS
      REASONABLE ...................................................................................................25

      A.   A Reasonable Percentage of the Fund Recovered Is the Appropriate
           Method to Use in Awarding Attorneys' Fees in Common Fund Cases................25

      B.   Consideration of Relevant Factors Justify an Award of a 27.5 % Fee in
           This Case.................................................................................................26

790507_1

Page

1.   The Excellent Settlement Achieved ............................................................26

2.   Objections by Class Members to the Settlement or Requested Fee ..........27

3.   The Diligent Prosecution of This Case .....................................................27

4.   The Complexity of the Litigation's Factual and Legal Questions ............27

5.   The Risks of Litigation and the Contingent Nature of the
     Representation ...........................................................................................28

C.   Counsel for Lead Plaintiff Should Be Paid for the Expenses Incurred ................30

X.   CONCLUSION ........................................................................................................30

790507_1

I, SAMUEL H. RUDMAN, declare as follows:

1.      I am a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), lead counsel for plaintiff in this action.  I was actively involved in the prosecution of this action (hereinafter, the "Litigation"), am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my participation in material aspects of the Litigation as well as my review of the entire case file in this action.

2.      I submit this declaration in support of plaintiff's application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for final approval of: (a) the Amended Settlement Agreement dated May 16, 2012 (the "Stipulation"),[1] which provides for a cash settlement amount of $22,500,000 plus interest earned; (b) the proposed Plan of Distribution; and (c) Lead Counsel's application for attorneys' fees and expenses.

## I.      PRELIMINARY STATEMENT

3.      This is a securities class action brought by Macomb County Employees' Retirement System ("Lead Plaintiff" or "Plaintiff") on behalf of all purchasers or acquirers of Pall Corporation ("Pall" or the "Company") common stock between April 20, 2007 and August 2, 2007, inclusive (the "Class Period"), for violations of the federal securities laws, specifically §10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b), 78t(a) and Rule 10-b(5) promulgated thereunder.  The claims asserted are brought against Pall and two of its then current or former officers and directors: Eric Krasnoff, Pall's Chief Executive Officer ("CEO") and President, and the

---

[1]      Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Stipulation.

- 1 -

790507_1

Company's Chairman and CEO since 1994; and Lisa McDermott, Pall's Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO") and Vice President of Finance and Treasurer.[2]

4.     This Litigation has been vigorously prosecuted from its commencement on August 14, 2007.  Specifically, Plaintiff has:

(a)     thoroughly investigated the facts underlying Pall's quarterly and annual financial statements and representations related to the Class Period;

(b)     analyzed and reviewed industry and securities analyst reports and media files concerning Pall, including press releases and statements issued by Pall and the Individual Defendants;

(c)     analyzed and reviewed approximately 14 witness accounts of Pall's operations and finances given by percipient witnesses including former Pall employees;

(d)     researched and filed two comprehensive complaints including the operative Consolidated Amended Complaint for Violations of the Federal Securities Laws ("CAC") filed on August 4, 2008 (Dkt. No. 46);

(e)     successfully opposed Defendants' motion to dismiss the CAC by drafting and filing Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Dkt. No. 54);

(f)     propounded discovery, including interrogatories and requests for production to Defendants;

---

[2]     Eric Krasnoff and Lisa McDermott are collectively referred to herein as the "Individual Defendants."  Pall and the Individual Defendants are collectively referred to herein as "Defendants."

790507_1

(g)    served ten subpoenas on third parties requesting both documents and deposition testimony;

(h)    aggressively pursued discovery from Defendants and numerous third parties pursuant to Lead Plaintiff's discovery requests and subpoenas;

(i)    successfully moved the Court for key documentary evidence which Defendants sought to withhold;

(j)    reviewed and analyzed approximately 19,000 pages of documents produced from Defendants and third parties in response to Lead Plaintiff's document requests and subpoenas;

(k)    took the deposition of KPMG LLP; noticed numerous additional depositions including Defendants Pall, Eric Krasnoff and Lisa McDermott, and third parties Tom Kelly, John Crawbuck, Ted Frisch, Steven Strauss and Rob DeGuadenzi;

(l)    retained and consulted with a tax expert regarding Pall's tax fraud scheme;

(m)    retained and consulted with a loss causation and damages expert regarding Pall stock price movement during and around the Class Period;

(n)    researched and fully briefed Lead Plaintiff's motion for class certification; and

(o)    prepared a comprehensive mediation statement, participated in mediation, and conducted extensive settlement negotiations.

5.    This cash settlement of $22,500,000, plus interest, is the product of extensive and hard-fought litigation and negotiations and fully takes into consideration the risks specific to this case.  Defendants aggressively pursued dismissal on theories both novel and traditional.  It was not until Plaintiff beat Defendants' motion to dismiss the CAC, fought for and secured certain discovery, and moved for class certification that meaningful settlement negotiations could begin.

790507_1

6.    The Settlement was negotiated over a period of seven months, with the assistance and oversight of the Honorable Daniel Weinstein (Ret.).  The Settlement was negotiated by experienced counsel for Plaintiff and Defendants with each having a firm understanding of both the strengths and weaknesses of their respective positions.  Specifically, Plaintiff and Defendants participated in one formal mediation session and numerous telephone conferences aimed at reaching an agreed upon resolution.  In connection with the mediation, Plaintiff expended substantial efforts, including extensive analysis of documents produced and examination of Plaintiff's and Defendants' theories of scienter, loss causation, and damages.  Plaintiff prepared, submitted and presented comprehensive mediation materials including briefing, documentary evidence, and graphics.

7.    Lead Counsel believe this settlement, $22,500,000 plus interest, represents a very good result for the Class.  As discussed below, proceeding with this Litigation through summary judgment and trial would have posed a number of real and substantial risks for the Class.  For example, there was a substantial risk that the Court or a jury would find that Plaintiff failed to meet its burden in demonstrating the requisite scienter.  There was also a substantial risk that a jury would conclude that Plaintiff failed to demonstrate loss causation or that certain of the alleged false statements were protected by the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA").

8.    Plaintiff's burden at summary judgment and trial would also require expert testimony, *inter alia*, on complex issues of tax, accounting, and forecasting of financial results and damages. Even with the most competent experts in these fields, there could be no guarantee that Plaintiff would prevail on liability and damages, as Defendants' experts would be presented to counter Plaintiff's experts' theories.  Indeed, regardless of the merits, a jury's impression of a party's expert is an unknown factor which presents a substantial risk at trial.

- 4 -

9.     Finally, even if Plaintiff prevailed on any or all of its claims at trial and was awarded damages, there was a substantial risk that Defendants would appeal any verdict or award.  The appeals process could take years, during which time the Class would have received no distribution at all.  Further, any appeal would also create the risk of reversal, in which case the Class would receive nothing after prevailing at trial.

10.     These issues and others were thoroughly considered in deciding to settle the Litigation.  In reaching the determination to settle, Lead Counsel weighed the evidence and legal authority supporting Plaintiff's allegations against the anticipated testimony of certain witnesses, documents, and legal authority that Defendants believed undermined the strength of Plaintiff's claims, as well as Defendants' characterizations and interpretations of the evidence and damages in this case.  For example, at Defendants' request, Lead Counsel reviewed the U.S. Securities and Exchange Commission ("SEC") testimony of certain key players from the Company's tax department who were terminated by the Company as a result of the Company-initiated, third-party investigation of Pall's tax fraud. Defendants' proffered interpretation of this testimony was that the admitted fraud had been deliberately concealed from Pall's executive management.  While Plaintiff interpreted the testimony differently, there was a risk that at summary judgment and/or trial, the fact finder could accept Defendants' interpretation of the testimony and find that the fraud was concealed from senior management.

11.     On balance, considering all the circumstances and risks both sides faced at trial, the conclusion was reached that settlement on the terms agreed upon was in the best interests of the Class.  The Settlement confers a substantial benefit on the Class now, and eliminates the significant risks of trial, the outcome of which was uncertain.  It is respectfully submitted that the Settlement should be approved as fair, reasonable and adequate.

12.     Lead Counsel has concurrently filed a detailed fee application for 27.5% of the Settlement Fund.  Such a request is fair both to the Class and Plaintiff's counsel and is within the range of fees frequently awarded in similar actions and is entirely justified in light of the substantial benefits conferred on the Class, the risks undertaken by counsel, the overall quality of representation, and the complex nature and extent of legal services performed.

13.     Lead Counsel will also seek approval of expenses reasonably and necessarily incurred in prosecuting the Litigation.  Lead Counsel prosecuted this action on a wholly contingent basis for over five years and advanced or incurred significant litigation expenses.  In doing so, Plaintiff's counsel have long borne the risk of an unfavorable result.  Furthermore, Plaintiff's counsel have not received any compensation for their substantial efforts, nor have they been paid for their substantial expenses.  The vigorous nature of the Litigation resulted in significant expenses, as well as the investment of thousands of hours of attorney and other professional time.

14.     Specifically, Plaintiff's counsel have incurred expenses to date of $152,855.17.  This amount includes: (a) the substantial fees and expenses of consultants, experts and investigators whose services were required in the successful prosecution and resolution of this case; (b) photocopying and imaging thousands of pages of documents; (c) online factual and legal research; and (d) mediation fees.  As demonstrated herein by the efforts required to achieve this Settlement, these expenses were reasonably and necessarily incurred to obtain this result.

## II.    RELEVANT PROCEDURAL HISTORY AND FACTUAL SUMMARY OF PLAINTIFF'S CLAIMS

15.     This action commenced on August 14, 2007, in the United States District Court for the Eastern District of New York, with the filing of a complaint captioned *Robert Baughman v. Pall Corp., Eric Krasnoff and Lisa McDermott*, No. CV-07-3359.  Shortly thereafter, three additional related actions were filed also alleging claims arising out of the federal securities laws.

16.     On May 28, 2008, the Court entered a Memorandum & Order consolidating these cases and appointing Macomb County Employees' Retirement System as lead plaintiff and Robbins Geller as lead counsel.  Dkt. No. 44.  On August 4, 2008, Lead Plaintiff filed the CAC. Dkt. No. 46.

17.     As alleged in the CAC, Pall manufactures and markets filtration, purification, and separation products and integrated systems solutions.  The CAC alleges that during the Class Period, Defendants engaged in a massive financial fraud whereby hundreds of millions of dollars of untaxed foreign earnings were diverted to fund the Company's domestic operations.  Pall, through its subsidiaries, had engaged in certain intercompany sales transactions which were never settled through actual cash payments. Under U.S. tax laws, these unsettled intercompany transactions should have been treated as income on Pall's tax returns, but were not. Pall subsequently admitted that its tax liabilities were understated for a nine-year period from 1999 through April 30, 2007 and restated nine years of financial statements.  The Company further admitted that it owed at least $278 million in back taxes, penalties and interest to U.S. and foreign tax authorities.

18.     The CAC also alleged that, throughout the Class Period, Defendants issued numerous statements and filed reports with the SEC regarding the Company's current financial performance and future earnings.  These statements were materially false and misleading because Defendants knew, but failed to disclose: (a) that the Company had engaged in an improper tax avoidance scheme whereby it shifted certain of its income to lower tax jurisdictions through the overpayment of commissions to one of its non-U.S. subsidiaries; (b) that, since at least 1999, the Company's reported income tax liability had been materially understated; (c) that the Company's publicly disseminated financial statements materially violated Generally Accepted Accounting Principles ("GAAP") and SEC reporting requirements; and (d) as a result of the foregoing, the Company's

- 7 -

effective tax rate would now be significantly higher and the Company would be forced to pay back taxes and fines of at least $278 million.

19.     Further, the CAC alleged that, as part of this scheme Defendants diverted hundreds of millions of dollars (approximating between $398 million and $677 million) from Pall's foreign subsidiary, Pall Netherlands BV, to fund the Company's domestic operations, thus reducing its domestic borrowing costs. The scheme provided Pall with tax-free use of the funds.

20.     The CAC alleges that on July 19, 2007, Pall shocked the market by announcing that the Audit Committee of its Board of Directors had commenced an "inquiry" into the "possibly" of material understatement of U.S. income tax payments and into its provision for income taxes in certain prior periods beginning with its fiscal year ended July 31, 1999.  In response to this announcement, the price of Pall common stock declined from $48.78 per share to $41.11 per share, on extremely heavy trading volume.  On August 2, 2007, Pall issued a press release announcing that the Company's annual and quarterly financial statements for the fiscal years 1999 through 2006 and for each of the fiscal quarters ended October 31, 2006, January 31, 2007, and April 30, 2007 "should no longer be relied upon" and that a restatement of some or all of those financial statements would be required. In response to this announcement, the price of Pall common stock declined from $39.10 per share to $38.62 per share, on extremely heavy trading volume.  On January 29, 2008, Pall announced the conclusion of its Audit Committee's inquiry into the Company's underpayment of U.S. income taxes. Among other findings, the inquiry concluded that the underpayment resulted, primarily, from the intercompany sale of products from Pall Netherlands BV to Medsep Corporation that were not settled through actual cash payments.

21.     The CAC further alleges that on March 28, 2008, Pall issued its Annual Report on SEC Form 10-K for the fiscal year ended July 31, 2007, which included restated prior period

- 8 -

financial statements revealing the true magnitude of the fraud. As reported, through July 31, 2006, Defendants overstated Pall's stockholder equity by $241,599,000, or nearly 26%.  Pall's originally reported earnings for fiscal 2006 alone were overstated by $93,353,000, or 179%.  For the first nine months of fiscal 2007, Pall's reported earnings were overstated by $36,592,000, or 33%. Through July 31, 2007, the Company recognized $277,805,000 in additional taxes, penalties, and interest.

22.     The CAC further alleges that during the time that Pall was materially understating its tax liabilities and materially overstating its financial results, the Individual Defendants and other Pall insiders sold more than $47.8 million worth of their personally-held shares to the unsuspecting market.

23.     On September 19, 2008, Defendants filed a motion to dismiss (Dkt. No. 47) and on November 3, 2008, Plaintiff filed a comprehensive memorandum in opposition to Defendants' motion to dismiss.  Dkt. No. 54.  On September 21, 2009, the Court issued a Memorandum & Order denying Defendants' motion to dismiss the CAC finding that Plaintiff had sufficiently pled scienter as required by the PSLRA. Dkt. No. 58.  In rejecting Defendants' assertions that they were unaware of information demonstrating false financials and that the tax code was complex, the Court held that "Defendants should have familiarized themselves with the facts relevant to the tax and accounting practices to ensure that the SEC filings they signed were truthful and accurate, at least in so far as to prevent inaccuracies of such magnitude that continued for such a prolonged period of time." *Id*. at 19. The Court further noted that "financial statements were signed by Krasnoff as CEO" and "McDermott as Chief Accountant" and they "(1) had access to information suggesting that the underlying tax liabilities and rate were inaccurate, and, (2) knew, or should have known that any reports or statements based on these numbers were not accurate, especially given the significance of the inaccuracies." *Id*. at 18, 19.

790507_1

24.     Thereafter, on October 9, 2009, defendants moved for certificate of appealability.
Dkt. No. 59.  Plaintiff filed an opposition to this motion on November 9, 2009 (Dkt. No. 65), and on
November 24, 2009, the Court issued a Memorandum & Order denying Defendants' motion on the
grounds that they failed to satisfy their burden of demonstrating "exceptional circumstances" that
would justify granting interlocutory appeal in this case (Dkt. No. 68).

25.     On December 28, 2009, Defendants filed their Answer to the CAC.  Dkt. No. 70.

## III.   FACT DISCOVERY

### A.     Discovery Overview

26.     Immediately subsequent to the November 24, 2009 Order denying Defendants'
motion for certificate of appealability, Plaintiff began devising a plan for discovery that would target
the key issues in the case and move the case forward in a swift yet cost-efficient manner.  To that
end, Plaintiff conferred with Defendants pursuant to Federal Rule of Civil Procedure 26(f) in order
to jointly arrive at a discovery plan for submission to the Court.  On February 12, 2010, the parties
began a series of discussions as part of their overall Federal Rule of Civil Procedure 26(f)
conference.  These discussions were continued on March 22, 2010, May 5, 2010, June 3, 2010 and
were completed on July 9, 2010, and involved the parties' respective positions regarding the scope of
discovery and timing of the joint submission of the Rule 26(f) conference statement and discovery
plan.

27.     On July 22, 2010, the parties submitted their joint Rule 26(f) Report and Proposed
Discovery Plan ("Joint Statement"), including a joint discovery plan and schedule, to the Court for
its consideration and approval.  Dkt. No. 81.  The Joint Statement indicated that the parties agreed on
the vast majority of issues that would need to be determined as part of the Litigation.  During the
course of the above discussions, the parties also agreed to a Stipulation and [Proposed] Order

- 10 -

Governing Confidential Material (Dkt. No. 79), and a Stipulation Regarding Discovery from Retained Experts (Dkt. No. 80), which were also submitted to the Court on July 22, 2010 and approved by the Court on July 23, 2010.

28.     On July 22, 2010, the Court issued a Scheduling Order setting a final pretrial conference for December 15, 2011.  Dkt. No. 83.

29.     Thereafter, Plaintiff's discovery efforts ensued in earnest.  At the time the parties reached a settlement-in-principle, Plaintiff had received and reviewed thousands of pages of documents in its discovery efforts.

**B.     Lead Plaintiff's Discovery Requests to Defendants**

30.     On July 16, 2010, consistent with Lead Plaintiff's intent to aggressively pursue discovery, it served Defendants with Lead Plaintiff's First Request for Production of Documents to All Defendants, a set of more than fifty document requests carefully designed to capture the documents most relevant to the Company's nine-year tax fraud including, for example, documents relating to the restatement, to any investigations of the nine-year tax fraud, and to the Company's treatment of intercompany payable balances.  Plaintiff's counsel were diligent in reviewing more than 9,000 pages of documents that came in from Defendants alone and uncovered a number of important documents which would have been instrumental in establishing the requisite level of scienter – conscious misbehavior or recklessness – on the part of the Individual Defendants.

31.     On January 31, 2011, Plaintiff served Pall with a notice of deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), seeking to depose the Company on issues relevant to Plaintiff's allegations, including Pall's processes and procedures relating to its income tax liabilities as well as any and all internal and external investigations relating to Pall's underpayment of U.S. tax liabilities from 1999 to 2007.  In addition to seeking the Company's testimony on key substantive

- 11 -

issues alleged in the CAC, Plaintiff also demanded testimony on the Company's electronic systems, on witnesses with relevant knowledge and on the scope of the Company's document production among other things.  Plaintiff's Rule 30(b)(6) deposition notice to Pall was designed to aggressively pursue the Company's testimony on key issues early in the discovery process and to streamline discovery efforts going forward.

     **32.**    On October 17, 2011, with the benefit of having taken and received some discovery from third parties as discussed below in paragraphs 33-40, Plaintiff served a notice of deposition on Individual Defendants Eric Krasnoff and Lisa McDermott.

     **C.**    **Lead Plaintiff's Discovery Requests to Third Parties**

     33.    In addition to aggressively pursuing discovery directly from the Company and the Individual Defendants, Plaintiff advanced discovery efforts with multiple nonparties known or believed to possess relevant information regarding facts alleged in the CAC.  For example, on January 28, 2011, Plaintiff served subpoenas for documents on KPMG LLP ("KPMG"), Ernst & Young LLP, PricewaterhouseCoopers LLP ("PwC"), and True Partners Consulting LLC for all documents related to their professional services rendered for Pall, including any such services or advice related to tax issues, the restatement, and audits or internal reviews conducted of Pall's internal controls and procedures. The subpoenas further requested all communications with the Individual Defendants as well as all communications with regulatory agencies including, among others, the SEC and the DOJ both of which conducted investigations into the tax matter.  The subpoenas were amended as to location of production and re-served beginning on April 1, 2011. The service of these subpoenas was only the first step in a long and hard-fought battle to obtain relevant documents from these entities which had first hand knowledge of Pall's tax evasion. Plaintiff spent many months meeting and conferring, exchanging numerous letters and e-mails with

counsel for third parties and Defendants (who were instructing third parties to withhold responsive documents on privilege grounds), and when that failed, ultimately seeking and obtaining an order from the Court compelling the production of said documents (as discussed below in paragraph 45). Third parties produced approximately 10,000 pages of documents in response to Plaintiff's discovery requests.

34.     On February 11, 2011, Plaintiff served KPMG with a subpoena for deposition, amended on April 4, 2011 as to the date of deposition. The subpoena called for a Rule 30(b)(6) witness to testify at deposition on topics related to KPMG's professional services performed for Pall including audits, consulting, reviews, tax advice, and any actual or contemplated restatement including Pall's March 28, 2008 restatement of nine-years worth of financial statements.

35.     On July 8, 2011, Plaintiff's counsel took the deposition of Vincent Castoro, the Rule 30(b)(6) deponent for KPMG.  This was a critical deposition as, in Plaintiff's view, KPMG's testimony, which is marked confidential, corroborated various of Plaintiff's allegations.

36.     Plaintiff also pursued discovery from Grant Thornton, LLP ("Grant Thornton"), whom Pall engaged to perform an E&P Study from FY 1999-2006 to support tax calculations used in the March 28, 2008 restatement.  On July 6, 2011, Plaintiff served a subpoena for documents on Grant Thornton for all documents related to their professional services rendered for Pall, including any such services or advice related to tax issues, the restatement, and audits or internal reviews conducted of Pall's internal controls and procedures. The subpoena further requested all communications with the Individual Defendants as well as all communications with regulatory agencies including, among others, the SEC.  Grant Thornton served objections on July 20, 2011, and Plaintiff followed up with meet-and-confers and discovery letters pursuing Grant Thornton's relevant, responsive documents.

790507_1

37.     On October 17, 2011, Plaintiff noticed the deposition of a specific individual at PwC, whose testimony Plaintiff expected to corroborate Plaintiff's allegations of scienter.

38.     In addition to Pall's auditors, Plaintiff also propounded discovery on certain of Pall's former employees who were in a position to know how the fraudulent scheme was devised and effected. Between October and December 2011, after having to use internal investigators to find and locate the witnesses, Plaintiff subpoenaed for depositions four former high-level employees at Pall including Tom Kelly (former Director of International Tax) (re-noticed on December 6, 2011), John Crawbuck (former Assistant Director of Tax), Ted Frisch (Director of Tax Accounting and Reporting) and Steven Strauss (Treasury Analyst/Internal Audit) all of whom were involved in Pall's tax reporting during the relevant time period.

39.     With respect to third parties Ted Frisch and John Crawbuck, Plaintiff also negotiated a separate stipulation with their attorneys by which Plaintiff was permitted to review the transcripts of Ted Frisch and John Crawbuck interviews taken during the SEC's investigation into the alleged tax fraud at Pall. Such transcripts were produced under such terms that Plaintiff's counsel could review, but not make or keep copies of such transcripts. Accordingly, Plaintiff's counsel reviewed and returned the transcripts thereafter.

40.     As part of the pursuit of discovery on the issues relevant to the Litigation, Plaintiff engaged in extensive correspondence and meet and confer sessions with Defendants and third parties in order to secure evidence to pursue the claims alleged.

### D.     Defendants' Discovery Sought from Lead Plaintiff

41.     In addition to Plaintiff's aggressive pursuit of discovery from Defendants and third parties, Plaintiff defended against Defendants' detailed requests for information from Lead Plaintiff concerning, *inter alia*, its purchases and sales of Pall securities during the Class Period and its

- 14 -

participation in the litigation.   Plaintiff spent significant time and effort defending against Defendants' wide-ranging discovery demands of Plaintiff.

42.     For example, on September 28, 2011, Defendants served a subpoena for documents on Navellier & Associates, Inc. ("Navellier") for all documents related to their professional services rendered for Lead Plaintiff, including any such services related to investment advice, Plaintiff's investment goals and strategies and ultimate decisions to purchase and/or sell Pall securities.   Upon being served with this request, Plaintiff worked with Navellier to review relevant responsive documents for privilege.

43.     In response to Defendants' discovery requests, Lead Plaintiff produced approximately 1,700 pages of documents.

### E.     Lead Plaintiff's Motion to Compel Investigative Documents

44.     Through careful review of the documents and testimony, Plaintiff's counsel learned of additional critical investigative documents that had been withheld from the productions of Defendants and third parties.

45.     Lead Plaintiff engaged with counsel for Defendants and third parties in a lengthy meet-and-confer process regarding the production of investigatory information by Pall and its auditors.   The parties were unable to reach an agreement and on September 13, 2011, Lead Plaintiff filed a motion to compel the production of such documents.   Dkt. No. 90.   Lead Plaintiff filed supplemental briefing on October 24, 2011 (Dkt. No. 100) and October 28, 2011 (Dkt. No. 103).

46.     Lead Plaintiff argued that these documents were central to the fraud allegations and seminal to the case.   Defendants asserted both work-product and attorney-client privilege while Lead Plaintiff asserted that underlying facts of the fraud were not protected by privilege, and even if they were, the privilege had been waived.

- 15 -

47.     On November 3, 2011, Magistrate Judge Lindsay issued a decision granting Plaintiff's motion to compel the production of investigative documents.  Dkt. No. 104.

**F.     Protective Order**

48.     The parties spent a significant amount of time negotiating the terms of a proposed confidentiality order that would govern the treatment of confidential evidence produced in this case. In the course of negotiating the protective order, the parties exchanged multiple drafts and comments on a Stipulation and [Proposed] Order Governing Confidential Material.  The parties reached an agreement and filed the Stipulation and [Proposed] Order Governing Confidential Material on July 22, 2010.  Dkt. No. 79.  On July 23, 2010, the Court approved the Stipulated Protective Order via paperless docket text entry.  On November 4, 2011, the parties entered into a Modification to Stipulation and Order Governing Confidential Material to cover the identities of confidential witnesses.

**IV.     INVESTIGATORS, CONSULTANTS, AND EXPERTS**

**A.     Investigators**

49.     In the post-PSLRA era, the engagement of third party investigators to assist in the gathering of detailed, fact-specific information from percipient witnesses is a necessary part of drafting a highly particularized complaint to meet the pleading standards mandated by the PSLRA. To that end, prior to the filing of the CAC, counsel for Lead Plaintiff retained experienced private investigators from L.R. Hodges & Associates, Ltd. ("L.R. Hodges") to perform investigative and consulting services relating to the Litigation.  At the direction of Lead Counsel, L.R. Hodges helped identify, locate and interview former Pall employees and other knowledgeable percipient witnesses likely to have information pertinent to the issues and claims alleged.  In total, the investigators

- 16 -

interviewed approximately 14 potential witnesses and discussed their findings and research with Lead Counsel.

50.     In fact, the CAC referenced five confidential witnesses each of whom was in a position to know and report on facts concerning Pall's business in and around the Class Period.  The fruits of the investigation also provided Lead Plaintiff and Lead Counsel with important information leading to the identity of additional witnesses likely to have relevant information and further evaluation of the strengths and weaknesses of Plaintiff's case.  That investigative effort continued through comprehensive follow up to confirm facts with witnesses.  In sum, the efforts of the private investigators were integral in achieving this outstanding settlement on behalf of the Class.

## B.      Forensic Accounting Consultants

51.     The Litigation, and particularly the accounting allegations in the CAC, present significant challenges requiring the employment of forensic accountants to assist in analyzing the claims and factors supporting the claims against the backdrop of the relevant accounting principles and standards.  Plaintiff's CAC alleged material violations of GAAP and that these GAAP principles were knowingly or recklessly disregarded.

52.     Here, in addition to denying any intentional wrongdoing, Defendants took the position that the rules relating to their understatement of taxes were highly technical and complex supporting that they did not have knowledge of the nine-year understatement of taxes.  *See, e.g.*, Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Complaint, at 3-4, 7, 21-22.  Dkt. No. 49.  Therefore, forensic accountant expertise was necessary in the preparation of the CAC and Plaintiff's opposition to the motion to dismiss.  It was also critical for Plaintiff to employ forensic accounting assistance to review numerous accounting documents produced by Defendants and third parties, to assist in designing the approach to

accounting related discovery, and in preparing and taking the KPMG deposition.  These complex accounting issues necessitated a detailed examination of the documents produced by Pall, KPMG and other third parties, as well as Pall's initial and restated financial reports filed with the SEC relevant to the Class Period.  To this end, the forensic accountants also helped to analyze Pall's SEC filings, press releases, financial statements and accounting records, including documents provided by Defendants and third parties as well as the Company's application of GAAP and SEC guidelines.

> **C.    Tax Expert**

53.    Given the specialized nature of the applicable tax law, expertise in the area was necessary in the development of the case.  As information was produced, it became critical for Plaintiff to employ a tax specialist to assist in the review and interpretation of numerous tax-related documents produced by Defendants and third parties, to assist in designing the approach to further discovery, and to prepare for and take the KPMG deposition.  The complexity of the tax issues required a detailed examination of the documents produced by Pall, KPMG and other third parties, as well as Pall's initial and restated financial reports filed with the SEC during the Class Period. Accordingly, Plaintiff hired and worked with a professor of taxation with expertise in the specialized area of Internal Revenue Code §956.

> **D.    Loss Causation and Damages Expert**

54.    Plaintiff's CAC alleged detailed facts demonstrating that Plaintiff's economic loss was proximately caused by Defendants' wrongful conduct.  Defendants, at the motion to dismiss stage, did not challenge the adequacy of Plaintiff's loss causation allegations.  However, Defendants' answer to the CAC filed on December 28, 2009, communicated unequivocally that loss causation would be a disputed issue going forward.  *See* Answer of Defendants' to Consolidated Amended Complaint, at 3, 24 ("Defendants deny that . . . any violation of the federal securities laws resulted in

damages to Plaintiff"; "Plaintiff's claims are barred, in whole or in part, for lack of proximate causation between Defendants' alleged conduct and the alleged harm.") (Dkt. No. 70). Moreover in 2010, the question of whether proof of loss causation was required as a prerequisite for class certification had created a split among circuit courts and on January 7, 2011, the United States Supreme Court granted certiorari of the question. *Erica P. John Fund, Inc. v. Halliburton Co.*, __U.S.__, 131 S. Ct. 856 (2011); *Erica P. John Fund, Inc. v. Halliburton Co.*, __U.S.__, 131 S. Ct. 2179 (2011). In recognition of the significance of the issue and Defendants' challenge to it, and in preparation for mediation, Plaintiff retained the services of Bjorn Steinholt ("Steinholt") of Financial Markets Analysis, LLC to assist Plaintiff in its analysis of loss causation – market efficiency and damages.[3]

55.     Financial Markets Analysis, LLC is an economic consulting firm that specializes in financial analyses and related economic consulting services regarding expert testimony and various economic issues that typically arise in securities class actions. Mr. Steinholt was retained to provide consulting services as well as analyze, and if necessary provide expert testimony, regarding issues related to market efficiency, loss causation, and the calculation of potential §10(b) damages suffered by purchasers of Pall securities during the Class Period.

56.     Mr. Steinholt provided Lead Counsel with substantial assistance in their analysis and opinions based on his professional experience as well as, *inter alia*, a review of: (a) the CAC;

---

[3]     On June 6, 2011, the Supreme Court issued an opinion in *Erica P. John Fund*, clarifying the scope of Federal Rule of Civil Procedure 23 as it pertains to whether a plaintiff must prove loss causation prior to certification of a class in a securities class action. The Supreme Court, in a unanimous decision, found that in a private securities fraud action based on violations of §10b and Rule 10(b)-5, proof of loss causation is not a condition precedent to obtaining class certification under Federal Rule of Civil Procedure 23. *Erica P. John Fund*, 131 S. Ct. 2179.

(b) Pall's public filings with the SEC; (c) press releases issued by Pall; (d) securities analyst reports regarding Pall and its industry issued during the relevant time period; (e) contemporaneous media reports regarding Pall and its industry issued during the relevant time period; (f) price and volume data for Pall common stock and options, as well as for industry and marked indices; (g) Pall common stock ownership by reporting institutions during the Class Period; and (h) articles, court decisions, and other relevant public information.

57.     Mr. Steinholt prepared an extensive report and made himself available several times to discuss with Plaintiff's counsel the strengths and weaknesses of the case from a damages and loss causation standpoint.  Mr. Steinholt's services in these proceedings were necessary and contributed materially to the benefits achieved by the Class.

## V.     THE STRENGTHS AND WEAKNESSES OF THE CASE

58.     Based on publicly available documents, discovery obtained from Defendants, its own investigation and consultation with experts, Lead Plaintiff believed that it had adduced and would continue to adduce substantial evidence to support its claims.  Lead Plaintiff also realized, however, that it faced considerable risks and defenses as the case proceeded.  Some of the most serious risks are discussed in the following paragraphs.  Lead Plaintiff carefully considered these risks during the months leading up to settlement and during settlement discussions with Judge Weinstein and the Defendants.

59.     Though the Court denied Defendants' motion to dismiss in its entirety, the Court did so with an abundance of caution and warned that Lead Plaintiff had satisfied its burden by a razor thin margin.

60.     In its motion to dismiss order, the Court also warned that if Lead Plaintiff did not further establish scienter on the part of Defendants, then the Court would revisit the claims on

summary judgment. And though Lead Plaintiff was confident in prevailing on summary judgment, the possibility of the Court granting summary judgment in favor of Defendants was real.

61.     Accordingly, summary judgment posed a number of real and substantial risks for the Class. Lead Plaintiff would have to demonstrate to the Court that a genuine issue of material fact exists with regard to each element of its securities claims. Summary judgment allows plaintiffs and defendants to present their strongest evidence to the Court. Here, there was a substantial risk that the Court would find evidence proffered by Plaintiff in support of scienter and/or loss causation inadequate to create a genuine issue of material fact. *See, e.g.*, *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 511-12 (2d Cir. 2010) (affirming grant of summary judgment on grounds corrective disclosure was insufficient to show loss causation). For example, Defendants would have proffered evidence supporting that any fraudulent activity was concealed from the Individual Defendants. Moreover, even if Plaintiff received a favorable ruling on summary judgment, Defendants would likely seek reconsideration of such a ruling, or, if the ruling was dispositive, appeal.

62.     If Plaintiff were to proceed to trial, there would be a substantial risk that the evidence in support of the highly technical aspects of Plaintiff's tax and accounting allegations, or in support of the Individual Defendants' knowledge of, or recklessness as to, the nine-year tax fraud, would not have convinced a jury to find in the Class's favor. Lead Plaintiff believes that the evidence supports its allegations and would have presented highly trained accounting and tax professionals as expert witnesses, as well as lay witnesses, who would testify accordingly. However, there is no guarantee that a jury comprised of lay people – who would likely possess little tax, accounting or financial expertise – would be persuaded by this testimony. In that event, the Class would recover nothing.

- 21 -

63.     In addition, there was a substantial risk that Plaintiff might not be able to prove loss causation at trial.  A private plaintiff who claims securities fraud must prove that the defendants' fraud caused an economic loss.  Loss causation can be proved with evidence of a stock price decline when the facts revealing a company's true financial condition are disclosed.  To establish loss causation, "'the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff.'"  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).  Indeed, after years of discovery, loss causation can prove at times to be an insurmountable hurdle at trial.  For example, this risk materialized in *In re BankAtlantic Bancorp, Sec. Litig.*  In *BankAtlantic*, plaintiff proved at trial that defendants' misrepresentations caused BankAtlantic Bancorp's stock price to be artificially inflated and returned a jury award for damages in favor of plaintiff.  Thereafter, defendants filed a motion for judgment as a matter of law arguing that plaintiff in that case failed to include sufficient proof of loss causation and damages.  The court, agreeing with BankAtlantic Bancorp, granted BankAtlantic Bancorp's motion for judgment as a matter of law and entered judgment.  *In re BankAtlantic Bancorp, Sec. Litig.*, No. 07-61542-CIV-UNGARO, 2011 U.S. Dist. LEXIS 48057, at \*69-\*72, \*125-\*126 (S.D. Fla. Apr. 25, 2011), *aff'd sub nom.* 688 F.3d 713 (11th Cir. 2012).  Investors recovered nothing.  It was therefore not lost on plaintiff that the risk of no recovery at all was a real possibility.

## VI.   SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT

64.     After informal discussions concerning the timing of potential mediation and its impact on the discovery schedule, the parties filed a stipulation and proposed order staying proceedings in order to meaningfully discuss settlement.  Prior to mediation, Plaintiff prepared a comprehensive mediation statement attaching numerous key documents obtained in discovery, as

- 22 -

well as a power point presentation. The parties engaged in their first formal mediation session on May 23, 2011 at JAMS in San Francisco. The mediation was attended by counsel Robert Rothman, Aelish Baig and S. Ashar Ahmed on behalf of Lead Plaintiff and the Class.

65.     On behalf of Pall, the mediation was attended by Lewis Liman and Nancy Ruskin of Cleary Gottlieb Steen & Hamilton LLP as counsel for Defendants. U.S. District Judge Daniel Weinstein (Ret.), presided over the May 23, 2011 mediation session at JAMS in San Francisco. The scope of liability and damages continued to be in dispute. No agreement could be reached on May 23, 2011 to resolve the claims.

66.     Following the May 23, 2011 formal mediation session, the parties continued to negotiate a potential resolution in telephonic conferences with Judge Weinstein being the intermediary between the parties and providing substantial assistance in bridging the divide. Notwithstanding these efforts, the parties failed to reach an agreement and Plaintiff continued to aggressively litigate the action by continuing to demand discovery, seeking Court intervention where needed (*see supra* ¶¶45-47) and filing the motion for class certification on December 1, 2011 (Dkt. No. 106). On or about December 15, 2011, the parties reached the Settlement Plaintiff now seeks to be approved by the Court.

67.     On January 30, 2012, the parties executed a Memorandum of Understanding. On April 26, 2012 Plaintiff filed a Settlement Agreement (Dkt No. 117) and Notice of Unopposed Motion for Preliminary Approval of Settlement (Dkt. No. 116). On May 16, 2012 Plaintiff filed an Amended Settlement Agreement (Dkt. No. 119) and Amended Notice of Unopposed Motion for Preliminary Approval of Settlement (Dkt. No. 118). On August 20, 2012 the Court granted the amended motion for preliminary approval of the Settlement. Dkt. No. 120.

- 23 -

## VII.   NOTICE TO MEMBERS OF THE SETTLEMENT CLASS

68.     On August 20, 2012, the Court issued an Order Preliminarily Approving Settlement and Providing for Notice ("Notice Order").  Dkt. No. 120.  As directed by the Notice Order, the Notice of Pendency and Proposed Settlement of Class Action ("Notice") and Proof of Claim and Release form ("Proof of Claim") were mailed to all identified Class Members beginning on September 14, 2012.  The Notice explains the Litigation, the Settlement, the Plan of Distribution of settlement proceeds, the fee and expense request, and the rights and options of Class Members.  As of November 15, 2012, over 43,800 Notices and Proofs of Claim had been mailed to potential Class Members and nominees.  *See* paragraphs 3-10 of the accompanying Declaration of Charles E. Ferrara Re: (1) Mailing of the Notice of Pendency and Proposed Settlement of Class Action and Proof of Claim and Release Form, (2) Publication of the Summary Notice, and (3) Internet Posting ("Ferrara Decl.").

69.     The Summary Notice, in the form approved by the Court, was published on September 21, 2012 in the national edition of *Investors' Business Daily* and over the *Business Wire*. Ferrara Decl., ¶11.  The Summary Notice also provided information about the Settlement and how to obtain a copy of the Notice.  In addition, the Notice and Proof of Claim were posted on the Claims Administrator's website.  Ferrara Decl., ¶12.

70.     In response to this extensive notice program, to date no objections or exclusions have been received.  Following the November 30, 2012 deadline for objections and exclusions, Plaintiff's counsel will report on any objections or exclusions in their reply papers.

## VIII.   THE PLAN OF DISTRIBUTION

71.     Upon approval of the Stipulation by the Court and entry of a judgment, and upon satisfaction of the other conditions to the Settlement, the Settlement Fund will pay for certain

administrative expenses, including the cost of providing notice to the Class; the cost of publishing

notice; payment of taxes assessed against the Settlement Fund; costs associated with the processing

of claims submitted; and Lead Counsel's approved fees and expenses.  The balance of the Settlement

Fund (the "Net Settlement Fund") will be distributed to Class Members who submit valid and timely

Proofs of Claim.

72.     Pursuant to the Notice Order and as set forth in the Notice, all Class Members who

wish to participate in the distribution of the Net Settlement Fund must submit a valid Proof of Claim

postmarked on or before December 13, 2012.  The Net Settlement Fund shall be distributed

according to the Plan of Distribution , which is set forth in detail in the Notice.

73.     If approved, the Plan of Distribution will govern how the proceeds of the Net

Settlement Fund will be distributed among Class Members who submit timely and valid Proof of

Claim forms. As explained in the Notice, the Plan of Distribution apportions the recovery among

eligible Class Members based on the timing of purchases and sales of Pall common stock. The Plan

of Distribution was developed with the assistance of Lead Plaintiff's damage expert and reflects an

assessment of the damages that may have been recovered had liability been successfully established

at trial. The proposed plan will distribute the recovery using two market-adjusted price declines.

Lead Plaintiff and Lead Counsel believe the Plan of Distribution is fair and reasonable and should be

approved by the Court.

## IX.   LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A.   A Reasonable Percentage of the Fund Recovered Is the Appropriate Method to Use in Awarding Attorneys' Fees in Common Fund Cases

74.     For Plaintiff's counsel's extensive efforts on behalf of the Settlement Class,

Plaintiff's counsel are applying for compensation from the Settlement Fund on a percentage basis.

- 25 -

The percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances, is supported by public policy, has been recognized as appropriate by the Supreme Court for cases of this nature, and represents the overwhelming trend in common fund actions in most circuits including the Second Circuit.

75.     The fee application is being submitted by Lead Counsel with the prior approval of the Plaintiff. As set forth in Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses ("Fee Memorandum"), a 27.5 % fee is a fair and reasonable attorneys' fee percentage request in common fund cases such as this and is within the range of the percentages typically awarded in securities class actions in this Circuit.

76.     As more fully set forth in the Fee Memorandum, Lead Counsel believe that the fee request is reasonable given the excellent recovery obtained for the benefit of the Class, the risks of litigation, the contingent nature of counsel's representation, the complexity of the legal and factual questions at issue, and the extensive efforts of counsel for the Lead Plaintiff.

77.     Moreover, Plaintiff has approved the 27.5% fee request. In the post-PSLRA era, the support of a court-appointed lead plaintiff is a significant consideration in setting a fair fee.

**B.      Consideration of Relevant Factors Justify an Award of a 27.5 % Fee in This Case**

**1.      The Excellent Settlement Achieved**

78.     The $ 22.5 million cash settlement here provides an immediate and certain benefit to the Class.  This favorable settlement was achieved as a result of the extensive prosecutorial and investigative efforts of Plaintiff's counsel and contentious motion practice and settlement negotiations, as detailed herein.  As a result of this Settlement, thousands of Class Members will

- 26 -

benefit and receive compensation for their losses and avoid the very real risk of no recovery in the absence of a settlement.

### 2.   Objections by Class Members to the Settlement or Requested Fee

79.   The Notice mailed to Class Members explains that Lead Counsel will seek an award of attorneys' fees of no more than 27.5% of the Settlement Fund and expenses up to a maximum of $200,000.  Pursuant to this Court's Notice Order, all objections must be served and filed no later than November 30, 2012.  Not a single objection has been received to date, although the deadline to object has not yet passed. This factor is relevant to a determination of the reasonableness of the fee request, especially in today's environment of increased shareholder activism in securities class action litigation.

### 3.   The Diligent Prosecution of This Case

80.   A 27.5% fee is also warranted in light of the extensive efforts on the part of Plaintiff's counsel, as outlined above, that were required to produce this Settlement. Counsel for Lead Plaintiff devoted significant resources to the case, *inter alia,* conducting formal and informal discovery, mastering the relevant facts and dynamics of Pall's business, drafting complaints as well as comprehensive memoranda of law concerning difficult and novel issues in connection with the motion to dismiss, conducting discovery conferences, attending Court hearings, formulating strategy, working with experts and other consultants in order to make effective arguments on the merits and to conduct meaningful settlement discussions, and otherwise preparing this case for trial.

### 4.   The Complexity of the Litigation's Factual and Legal Questions

81.   Courts have recognized that the novelty and difficulty of the issues in a case are significant factors to be considered in making a fee award. As demonstrated by the discussion above

- 27 -

of the contested issues in the Litigation, had this settlement not been reached, the complex factual and legal questions at issue would continue to be the subject of substantial analysis and dispute. Numerous complex issues would be involved in proving liability, including whether Defendants' statements were material, whether Defendants had a duty to disclose, whether Defendants acted with scienter, whether the alleged false statements and omissions were the legal cause of Plaintiff and the Class's damages, whether Pall common stock traded at artificially inflated prices, and whether Lead Plaintiff and the Class suffered damages, and if they did, the amount thereof.

### 5. The Risks of Litigation and the Contingent Nature of the Representation

82.     A determination of a fair fee must include consideration of the contingent nature of the fee, the financial burden carried by counsel, and the difficulties that were overcome in obtaining the settlement.

83.     This Litigation was undertaken by Plaintiff's counsel on a wholly contingent basis. From the outset, Plaintiff's counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the investment of time and money the case would require.  In undertaking that responsibility, Plaintiff's counsel were obligated to assure that sufficient attorney resources were dedicated to the prosecution of the Litigation and that funds were available to compensate staff and to pay for the considerable out-of-pocket expenses which a case such as this entails.

84.     Because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation.  With it often taking years for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

85.     As discussed above, this case had significant risks concerning liability, causation, and damages.  Lead Plaintiff's success was by no means assured, as both sides claimed the evidence supported their assertions.  Success hinged on Lead Plaintiff's ability to win challenging arguments on every element of the causes of action.  Were this Settlement not achieved, Lead Plaintiff faced years of costly and risky litigation against Defendants, with ultimate success far from certain.

86.     There was no guarantee that Lead Plaintiff would succeed in convincing the Court or a jury that the false statements made by Defendants during the Class Period were made with scienter, or that there were substantial damages.  Indeed, Defendants have adamantly denied liability and are represented by some of the most experienced and aggressive defense counsel.  There are numerous cases where plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours, have received no compensation.  We are aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a jury or judge following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

87.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to public companies.  Vigorous private enforcement of the federal securities laws can only occur if the private plaintiffs can obtain parity in representation with that available to large corporate interests.  If this important public policy is to be carried out, the courts must award fees that will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

790507_1

### C. Counsel for Lead Plaintiff Should Be Paid for the Expenses Incurred

88.     The payment of expenses to counsel who create a common fund is appropriate. Plaintiff's counsel have incurred expenses in the amount of $152,855.17.  A breakdown of the aggregate expenses incurred by category is contained in the declaration submitted herewith by counsel for the Lead Plaintiff.

89.     The Notice mailed to Class Members states that Lead Counsel intend to apply for expenses up to $200,000.  As with Lead Counsel's fee request, not a single objection has been raised to this request, although the deadline to object has not yet passed.

90.     The accompanying declaration filed on behalf of Robbins Geller sets forth the expenses incurred by Lead Counsel in the course of the Litigation.

### X. CONCLUSION

91.     For all of the foregoing reasons, Lead Counsel respectfully request the Court approve the Settlement and the Plan of Distribution of settlement proceeds, and award Lead Counsel fees of 27.5% of the Settlement Fund plus $152,855.17 in expenses, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Fund until paid.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 20th day of November, 2012, at Melville, New York.

s/ Samuel H. Rudman
_____
SAMUEL H. RUDMAN
